**PASCO TERMINALS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**C.D. 4823; Court No. 74–5–01357.**

United States Customs Court.

Sept. 26, 1979.

Williams & Connolly, Washington, D. C. (J. Alan Galbraith, Washington, D. C., on the briefs), for plaintiff.

Alice Daniel, Acting Asst. Atty. Gen., U. S. Dept. of Justice, Civil Division, Washington, D. C., David M. Cohen, Director, Commercial Litigation Branch, New York City (Velta A. Melnbrencis, Asst. Director, Commercial Litigation Branch, New York City, on the briefs), for defendant.

MALETZ, Judge:

This is an action to recover dumping duties that were assessed on four entries of crude or elemental sulphur which was exported from Mexico by the producer, Azufrera Panamericana, S.A. (Azufrera). Plaintiff, Pasco Terminals, Inc. (Pasco), was a wholly-owned subsidiary of Azufrera and paid the duties in question.[1] The case arises as follows:

On February 5, 1972, the Office of the Secretary of the Treasury published a determination that elemental sulphur from Mexico was being or was likely to be sold at less than fair value. Following this the United States Tariff Commission[2] instituted Investigation No. AA1921–92 to determine whether an industry in the United States was being or was likely to be injured, or was prevented from being established, by reason of the importation of such merchandise into the United States. Notice of the investigation and hearing was published on February 12, 1972, and a public hearing was held March 28–30, 1972. Azufrera participated in this investigation and appeared at the public hearing. Pasco did not enter an appearance as an interested party.

Thereafter, the Tariff Commission unanimously determined that an industry in the United States was being injured by reason of imports from Mexico of sulphur sold or likely to be sold at less than fair value (LTFV).[3] On May 4, 1972, the Commission notified the Secretary of the Treasury of its Determination of Injury [in Investigation No. AA1921–92] which was published in the Federal Register on May 10, 1972. See 37 F.R. 9417. Following this, on June 28, 1972, the Assistant Secretary of the Treasury published a finding of dumping with respect to sulphur exported from Mexico and subsequently the dumping duties in question were assessed and paid.

Plaintiff does not challenge the LTFV determination of the Secretary of the Treasury. Rather, it claims (1) that the Tariff Commission proceeding was procedurally defective in that (a) the Commission allegedly did not proceed in compliance with its own Rules of Practice and Procedure; (b) the Commission violated fundamental due process rights in the conduct of its hearing; and (2) that the Commission determination of injury was arbitrary, capricious, an abuse of discretion, and not according to law.

Each of these contentions will be considered later. But before that, it is important as background to set forth (1) those facts developed before the Commission as to which there is no genuine issue; (2) a summary of the evidence in the public record before the Commission supportive of its injury determination; and (3) the specific findings of the Commission.

### Facts Not in Dispute

We observe first that the following facts as developed before the Tariff Commission are not in real dispute:

1. During 1970–1971, the Mexican elemental sulphur here in issue was sold in the United States at LTFV prices.

2. The demand for sulphur is very inelastic, i. e., unresponsive to changes in price in the short run.

---

1. Previously, the Court of Customs and Patent Appeals held that Pasco had standing to maintain the action on the basis that it was agent for the contracting parties in respect of the four entries involved here and was therefore within the purview of section 514 of the Tariff Act of 1930, as amended (19 U.S.C. § 1514 (1970)), which provides in part that "protests may be filed by the importer, consignee or any authorized *agent* of the person paying any charge or exaction * * *." (Emphasis added.) *Pasco Terminals, Inc. v. United States*, 567 F.2d 976, 65 CCPA 28, C.A.D. 1201 (1977).

2. The United States Tariff Commission was subsequently renamed the United States International Trade Commission by section 171(a) of the Trade Act of 1974. (19 U.S.C. § 2231(a) (1976).)

3. In making the determination, the Commission considered the industry to consist of those domestic facilities of United States producers devoted to the mining and recovery of sulphur. Sulphur mined by the Frasch hot-water mining process (Frasch sulphur), the method used to produce the sulphur entered at LTFV from Mexico, was produced by five companies at 12 sites in the United States.

3. Elemental sulphur is a fungible commodity; the one distinction is price.

4. Most sulphur in the United States is sold under sulphur purchase contracts which contain a "meet-or-release clause," i. e., a provision which stipulates that if significant quantities of sulphur of a grade comparable to that being delivered by the supplier are offered to the purchaser at a price less than that being charged by the supplier, the supplier is obligated to either meet the lower price or to release that quantity of sulphur from the terms of the contract.

5. The United States Frasch sulphur producers during the relevant period were Freeport Minerals Co. (Freeport), Texas Gulf Sulphur Co. (TGS), Duval Corp. (Duval), Occidental Petroleum Corp. and Atlantic Richfield Co.

6. During all relevant times, the Mexican sulphur industry consisted of only two producers—Azufrera, which has dominated the industry for many years, with 70 to 85 percent of the total production, and Cia. Exploradora del Istmo, S.A. (CEDI).

7. Azufrera and CEDI are partly owned by the Mexican Government.

8.. During all relevant times, Azufrera's export sales policies and prices were controlled by the Mexican Government.

9. Of the two Mexican producers, only Azufrera sells in the Tampa market. Mexican sulphur is not sold in the inland waterways and rail-truck markets (which would include markets in the North Central States). Logistical considerations have prevented imports from Canada from entering the Tampa market.

10. The Tampa market is different from any other sulphur market in the United States and possibly in the world because 25 percent of all sulphur consumed in the United States is consumed in that market; the market is highly concentrated; and access is principally by liquid sulphur tankers. The customers in that market are for the most part large-scale sulphur consumers; they are shrewd; they generally have more than one supplier; they play the field to

obtain the best terms; they are in vigorous competition with each other; and their number is relatively small.

11. The East Coast market is separate and distinct from the Tampa market except that price activity in one market has an impact on other market areas.

12. Major producers, such as Freeport and TGS sell sulphur in both the East Coast and the Tampa markets and in some instances to the same customers in both areas.

13. In the Tampa market, the shipments in long tons of sulphur from Tampa terminals of the sulphur producers to Tampa area customers were as follows:

|  | AZUFRERA | FREEPORT | TGS | DUVAL |
|---|---|---|---|---|
| 1963 | 340,161 | 408,723 | 296,704 | |
| 1964 | 390,826 | 469,805 | 385,600 | |
| 1965 | 332,487 | 727,350 | 516,960 | |
| 1966 | 223,974 | 1,242,892 | 600,420 | |
| 1967 | 131,915 | 1,318,239 | 694,425 | |
| 1968 | 135,293 | 1,237,498 | 536,264 | |
| 1969 | 11,397 | 1,219,595 | 480,996 | 35,277 |
| 1970 | 130,962 | 1,123,778 | 616,446 | 238,821 |
| 1971 | 119,073 | 1,134,283 | 609,858 | 350,139 |
| 1972 * | 829 | 201,650 | 118,676 | 66,068 |

* For January and February only.

14. In late 1969, Duval opened its Culbertson Mine in west Texas. It then became a significant factor in the Tampa and East Coast markets.

15. During all relevant times, Duval's Culbertson Mine was not producing at capacity. In 1972 it was producing about 1.4 million tons but had an estimated capacity of 2 million tons a year.

16. Prices in the Tampa market declined from about $45 per ton at the beginning of 1969 to about $25 per ton in 1971.

17. In 1969, when sulphur prices decreased rapidly, Azufrera shipped only 11,-397 tons of sulphur in the Tampa area. Thus, in 1969, Azufrera was for all practical purposes out of the Tampa market.

18. Azufrera was out of the Tampa market in 1969 as a result of its decision, during a period of sulphur shortage in the years 1964 to 1968, to divert its sulphur to other markets where higher prices prevailed and not to renew existing contracts in the United States when they came up for renewal.

19. As a result of Azufrera's decision, during the period of sulphur shortage in the years 1964 to 1968, to divert its sulphur to other markets where higher prices prevailed, some of its existing customers in the United States were able to obtain only "pro-rated" amounts, while others were unable either to obtain any sulphur at all or were able to obtain sulphur only at prices higher than those which their competitors were paying for domestic supplies.

20. In 1970, Azufrera vigorously pursued sulphur contract negotiations with ten United States purchasers. Six of these ten United States purchasers (C. F. Chemicals, Agrico Chemical Co., American Cyanamid, W. R. Grace & Co., USS Agri-Chemicals, and Standard Spray & Chem. Co.) were also customers of Freeport and most of these six were Azufrera customers in previous years.

21. In 1970, Azufrera re-entered the Tampa sulphur market, increasing its sales in that market from 11,397 tons in 1969 to 130,962 tons. Of these 130,962 tons, 98,868 tons were sold to one customer, C. F. Chemicals.

22. The Tampa market increased by approximately 362,000 tons from 1969 to 1970 and by approximately 466,000 tons from 1969 to 1971.

23. In 1970, Duval increased its sales in the Tampa market by 203,000 tons over 1969. TGS increased its sales by 145,000 tons. Freeport lost 95,000 tons. Azufrera increased its sales by about 120,000 tons.

24. In 1971, Duval again made a strong gain, increasing its sales by 111,000 tons over 1970. Freeport, TGS and Azufrera remained at essentially the same level as in 1970.

25. Sometime in 1971, Freeport lowered its price to $25 per ton.

26. The initiation of the antidumping investigation in 1971 had a strong deterrent effect on Azufrera's sales. On October 6, 1971, Azufrera notified all customers of a $3 per ton increase.

27. In February 1972, Freeport announced an increase in its offering price of $3 per ton. Duval and TGS followed suit.

In March 1972, Freeport rescinded its announced price increase. Freeport satisfied itself that the "increase wasn't sticking." Azufrera was not selling in the Tampa market at that time.

28. As of the date of the Tariff Commission hearing in March 1972, some nine Frasch mines out of a total of 21 had been shut down.

29. While each geographical sulphur market has its own price, a drastic price cut in one market has a "ripple" effect in another market, particularly when the two markets are nearby and the same producers and the same customers are involved.

30. A general reduction in the sulphur price at Tampa tends to bring down the sulphur price on the Gulf Coast and the East Coast.

*Evidence Before the Commission Supportive of Injury*

In addition to these undisputed facts, there was evidence before the Commission supportive of injury. This evidence was that:

1. Azufrera was responsible for initiating price decreases in the Tampa market in these specific instances:

(a) In January of 1970, when the prevailing price for sulphur was $32 per ton, Azufrera's sulphur was being offered for sale at $30 per ton f. o. b. to one of Freeport's major customers. As a result, Freeport reduced its price from $32 to $30 per ton.

(b) In March of 1970, when the prevailing price for sulphur in Tampa was $30, Azufrera's sulphur was offered at $28 per ton to one of Freeport's major customers. As a result, Freeport lowered its price to that particular customer.

(c) In October of 1970, when the prevailing price for sulphur was $30, Azufrera's sulphur was offered at $28 per ton to one of Freeport's major customers. As a result, Freeport reduced its price to all customers in the Tampa area from $30 to $27 per ton on November 1, 1970.

(d) In January of 1971, Azufrera's sulphur was offered at $24 per ton to one of Freeport's major customers. In February of 1971, Azufrera's sulphur was offered at $25 per ton to one of Freeport's major customers. As a result of these offers, on March 10, 1971, Freeport reduced its price to all customers in the Tampa area from $27 to $25 per ton.

2. Part of the responsibility for the $7 price reduction during 1970–1971 was attributable to Azufrera.

3. In the absence of LTFV sales during 1970–1971 there would not have been a drop of $7 per ton in the price of sulphur.

4. Commencing with January 1, 1971 (when the prevailing price for sulphur in Tampa was $27), Azufrera's sulphur was sold in the Tampa area to USS Agri-Chemicals (one of Freeport's customers) at $25 per ton.

5. During the period 1970–1971, Freeport did not initiate any price decreases. It merely responded to price decreases initiated by suppliers of Mexican sulphur.

6. Duval was not responsible for initiating price cuts during 1970–1971 as demonstrated by the following:

(a) Duval's policy was to be a major supplier over many years to come and in accordance with that policy, it developed a market strategy which concentrated its new business on growth and not in interrupting existing buyer-seller relationships.

(b) Duval concentrated on buyers who had open contracts or had contracts which were terminating.

(c) Duval had sold sulphur in the United States since 1920 and had relations with other buyers which opened doors.

(d) Duval had a corporate policy of never offering a price to a customer under contract whereby the customer could place his other suppliers in a "meet or release" situation.

(e) Although Duval had made some price reductions in 1969, beginning in 1970 and extending through the period in issue, Duval made no price offer at below the prevailing price.

7. Since 1968, with one exception in early 1969, TGS has never sold or offered to sell sulphur in the United States at less than the established competitive price.

8. As a result of the LTFV sales of Mexican sulphur:

(a) Duval's profitability declined generally in the 1970–1971 period.

(b) Freeport lost gross sales revenue and had a lower profit margin on sales. (Freeport estimated that the reduction caused by the LTFV sales and offers cost it nearly $20 million in revenue.)

9. The sulphur price reduction in the Tampa area market caused by LTFV sales of Mexican sulphur had a "ripple" or "spillover" effect in the East Coast market.

10. During the years 1970–1971, neither Duval nor TGS had lost sales to any domestic company by virtue of the operation of the "meet or release" provisions of the existing contracts.

### The Commission's Findings

Finally, it is to be noted that the Tariff Commission's Determination of Injury included the Statement of Reasons for the Affirmative Determination of Chairman Bedell and Commissioners Sutton and Moore [4] and the separate Statement of Reasons for the Affirmative Determination of Commissioners Leonard and Young. Both statements dealt with economic conditions in the domestic industry, extent of LTFV sales and offers, price depression, and market disruption.

More specifically, on the basis of its investigation, the Tariff Commission found the following:

1. The domestic sulphur industry was beset by especially low prices which reflected a general world oversupply, which

---

4. Vice Chairman Parker concurred in the result.

had increased from 16.4 million long tons in 1967 to 21.7 million long tons in 1970 and seemed destined to continue to increase. As a result, the market for sulphur was glutted and prospects were for still additional amounts to enter the market.

2. As a result of the oversupply of sulphur,[5] the Frasch-sulphur producers, with large investment in the production of sulphur, had been forced to curtail exploration, shut down facilities, lay off workers, and had found their before-tax profits on sulphur operations substantially reduced.

3. Since the fall of 1968, sulphur prices had declined by about 50 percent in Tampa and along the Western Gulf and by about 40 percent along the East Coast and in the North Central States.

4. Despite the wide uses of sulphur, there were only a small number of major buyers—nine sulfuric-acid producers consumed at least 50 percent of the sulphur sold on the open market.

5. Sulphur was normally sold under tonnage contracts which required a seller to meet lower competitive offers or release that quantity from the terms of the contract.

6. In 1970, Mexican Frasch-sulphur producers had begun to sell at LTFV.

7. Mexican home market sulphur sales were traditionally made at the maximum prices permitted by Mexican law, which had remained unchanged since 1955. Consequently, as the oversupply developed and the United States price deteriorated, imports of Mexican sulphur began to enter at LTFV. By the period 1970–1971, virtually all sulphur from Mexico was entering the United States at LTFV margins ranging up to 40 percent of the adjusted home-market price.

5. A large part of the increase was due to the recovery of sulphur from natural gas containing hydrogen sulfide and from refinery gas.

6. These specific instances were noted by the Commission: (1) In the latter part of 1970, Mexican Frasch sulphur was sold at a price of $2 per ton below the price of domestic Frasch sulphur to an important Tampa customer. As a result, a few months later, its domestic supplier was obliged to meet the lower price. (2)

8. The sales and offers of Mexican sulphur at LTFV prices caused additional price deterioration in the Tampa market and on the East Coast and added confusion and instability to the market place. These markets had been largely isolated from other foreign competition, although to some extent price activity in one domestic market area had an impact on prices in other domestic market areas.

9. LTFV sales and offers of Mexican sulphur had contributed to the general depression of prices and to market disruption in Tampa (the principal United States sulphur-consuming area) and along the East Coast of the United States.

10. A part of the price depression undergone by the domestic industry since 1968 and part of the market disruption in Tampa could be directly tied to sales and offers of Mexican sulphur at LTFV.

11. When price sensitivity reached the degree which characterized the United States sulphur market in and since 1969, LTFV sales and offers would have almost inevitably caused an injurious impact.

12. The sales and offers of LTFV sulphur from Mexico were sufficient factors contributing to price depression and market instability in the United States.

13. Injury (more than *de minimis*) resulted both from specific instances[6] where the LTFV margins permitted underselling which, in turn, precipitated general price reductions, and from the presence of additional supply in an already glutted market.

14. The injury to the domestic industry was especially serious occurring as it did while the industry was in a transitional state.

At about the same time, a large quantity of Mexican sulphur was offered to another large Tampa customer substantially below the price of domestic sulphur to the same buyer. The domestic supplier elected to meet the price. These sales and offers precipitated a general price reduction of $2 per ton. The Commission found that these instances of underselling could not have occurred if sales had been made at fair value.

15. The injurious price depression from LTFV sales and offers did not end when domestic suppliers reestablished a price pattern based upon the unfair price. Since then, Mexican sulphur had continued to enter the United States market. The effect of these LTFV imports (even when made at prevailing prices) in an already oversupplied market resulted in further deterioration.

16. The fact that the domestic industry was facing difficulties caused by other factors did not obscure the significant link between the specific injury manifestations existing and threatened, and the LTFV imports.

### Whether the Tariff Commission Proceeded in Compliance With Its Own Rules of Practice and Procedure

■ We come now to plaintiff's first contention that the Tariff Commission proceeding was procedurally defective in that the Commission assertedly failed to abide by its own confidential business data rule—rule 201.6 of the Commission's Rules of Practice and Procedure which reads as follows:

§ 201.6 *Confidential business data.*

(a) *Definition.* Confidential business data consist of any information which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association, the disclosure of which is not authorized by law or by the party furnishing such information.

(b) *Identification of information submitted in confidence.* Business data which it is desired shall be treated as confidential shall be submitted on separate sheets each clearly marked at the top "Business Confidential". When sub-

mitted at public hearings such business data shall be offered as a confidential exhibit with a brief description of the nature of the information.

(c) *Acceptance of information in confidence.* The Commission may refuse to accept in confidence any information which it determines is not entitled to confidential treatment. In the event of such refusal, the person submitting such information will be notified thereof with a statement of the reasons and (if the information was submitted voluntarily) will be permitted to withdraw its tender.

In order fully to understand plaintiff's contention, some background is necessary. At the public hearing before the Commission, United States industry (principally Freeport) contended that Azufrera had depressed the price of sulphur through offers or sales that were under offers or sales then being made in the Tampa market. To support this contention, Freeport offered Confidential Exhibit 2, entitled "Tampa Price Chronology 1969–72." [7] This exhibit contained, among other things, the names of certain customers of Freeport who had furnished information to Freeport about offers allegedly made to them by competitors of Freeport. Freeport refused to disclose the names of these customers at the public hearing. Azufrera protested the use of this exhibit in confidence on the ground that if the exhibit were received, Azufrera should be allowed to inspect and use it in cross-examining Freeport's witnesses. The Commission overruled Azufrera's objection and received the exhibit in confidence.

It is to be added that the information that Freeport disclosed at the public hearing was considerably less detailed than that contained in exhibit 2 and that the Commission, in its injury determination, relied on Freeport's examples of offers assertedly

---

7. On June 1, 1978, the court ordered that the Tariff Commission transmit Confidential Exhibit 2 to the court under seal. The court's order further specified that the court would inspect the exhibit *in camera* for the purpose of determining whether it should be made available to opposing counsel under a protective order and for the limited purposes of the present litiga-

tion. *Pasco Terminals, Inc. v. United States,* 80 Cust.Ct. 249, C.R.D. 78–3 (1978). The Commission transmitted Confidential Exhibit 2 to the court on this basis. Subsequently, the court examined the exhibit *in camera* and on June 19, 1978 ordered that it be made available to counsel for plaintiff under a protective order— which was done.

made by Azufrera to customers of Freeport at prices below the then prevailing market price.

Against this background, plaintiff insists that Confidential Exhibit 2 is not within the class of documents which can be received in confidence under rule 201.6. The basis of this contention is that the exhibit does not contain information pertaining to income, profit, loss, or expenditures and cannot qualify as a "trade secret" because that term was ascribed a narrow meaning in *United States ex rel. Norwegian Nitrogen Products Co. v. United States Tariff Commission*, 55 App.D.C. 366, 6 F.2d 491, 495 (D.C.Cir. 1925), *rev'd*, 274 U.S. 106, 47 S.Ct. 499, 71 L.Ed. 949 (1927).

More particularly, in *Norwegian Nitrogen* the Court of Appeals for the District of Columbia stated that the "term 'trade secrets,' as ordinarily understood, means an unpatented, secret, commercially valuable plan, appliance, formula, or process, which is used for the making, preparing, compounding, treating, or processing of articles or materials which are trade commodities." 6 F.2d at 495. The court added that "[c]osts of production, of and by themselves, are simply matters of business privacy, the disclosure of which is not forbidden * *." *Ibid.* In these circumstances, the court expressed the opinion that cost of production information should have been provided to the petitioner but then affirmed the judgment of the lower court denying a writ of mandamus to the Commission.

However, this narrow construction of the term "trade secrets" and the conclusion that "trade secrets" do not cover costs of production are without legal significance. For upon writ of error in *Norwegian Nitrogen*, the Supreme Court vacated the judgment and remanded the case with directions to dismiss the petition as moot. *United States ex rel. Norwegian Nitrogen Products Co. v. United States Tariff Commission*, supra, 274 U.S. at 112, 47 S.Ct. 499. Moreover, in the later case of *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933), the Supreme Court stated that "[t]he Court of Appeals [in the prior *Norwegian Nitrogen* case] expressed an opinion, not called for by its judgment, that the information should have been given." 288 U.S. at 302, 53 S.Ct. at 353.

Beyond this, there are several affirmative factors which militate against plaintiff's contention that Confidential Exhibit 2 is not within the class of documents which can be received in confidence under rule 201.6. These factors are as follows:

First, a widely relied upon definition of a trade secret states that "[a] trade secret may consist of any formula, pattern, device *or compilation of information which is used in one's business*, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." (Emphasis added.) *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 474–475, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974).

Clearly, business data such as that contained in exhibit 2, which sets forth estimated annual sales to specific customers, identifies correspondence or conversations with specific customers, and discloses the prices charged to such customers on specific dates, qualify as information which gives Freeport an opportunity to obtain an advantage over competitors, such as Azufrera, who do not possess such information. Additionally, exhibit 2 was submitted in confidence because it contained information received in confidence and the disclosure of the names of the companies involved would adversely affect Freeport's relations with them. Obviously, if the information, which Freeport used in its own business for pricing purposes, had been disclosed, Freeport would have been at a serious disadvantage. Thus, exhibit 2 meets all the requirements of a "trade secret."

Second, the Commission's rule 201.6(a) defines confidential business data as "any information which concerns or relates to the trade secrets, * * * operations, * * or to the identity, confidential statistical data, amount or source of any income, profits, losses * * * of any * * * firm * * *, the disclosure of which is not authorized * * * by the party furnishing such information."

Since Freeport's income and profits derive from its sales and specific customer names identify the amount and/or source of such income and profit, and Freeport had not authorized disclosure, it would seem clear that the information contained in exhibit 2 meets the Commission's definition of confidential business data.[8]

Third, in *Norwegian Nitrogen Products Co. v. United States, supra,* 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796, the Court, after examining legislative history and other sources, noted that the Tariff Commission had a settled policy, acquiesced in by Congress, of withholding confidential information when its publication might work hardship or injustice or hamper the work of the Commission. *Id.* at 303–311, 319–323, 53 S.Ct. 350. Consequently, it held with regard to the Commission's rule which provided for examination of the record except for "trade secrets and processes" (*id.* at 325, 53 S.Ct. at 362):

> *  *  *  The phrase "trade secrets and processes" is not a new one in the law. It occurs in statutes and judicial decisions as well as in the rule. The Commission was without competence by any decision it might make to fix the meaning of the phrase as used by Congress or the courts. It had power, however, to interpret its own rules and any phrase contained in them. *Evans v. Backer,* 101 N.Y. 289, 292, 4 N.E. 516; *Duncan's Heirs v. United States,* 7 Pet. 435, 451, 452, 32 U.S. 435, 8 L.Ed. 739. This it has done by an administrative practice too clear to be misread.

By the same token, rule 201.6(c) makes it clear that the Commission has retained the power to interpret its own rules and any phrase contained in them, including the definition of confidential business data in rule 201.6(a). In this case, of course, the Commission specifically determined that exhibit

2 was entitled to confidential treatment. Not only did it have the power to do so, its interpretation was scarcely unreasonable.

Under the circumstances, it must be concluded that the Commission's decision to receive exhibit 2 on a confidential basis was in full compliance with its own Rules of Practice and Procedure.

## Whether the Commission Violated Due Process Rights in the Conduct of Its Hearing

We turn now to plaintiff's contention that the Tariff Commission violated Azufrera's due process rights in its conduct of the hearing. These asserted violations occurred in connection with an attempt by Azufrera to cross-examine Freeport on the specifics of Confidential Exhibit 2, and again in connection with Duval's refusal to answer on cross-examination specific questions with regard to alleged lower price offers it had made in the Tampa market, except on a confidential basis.

At the outset, defendant insists that plaintiff has no standing to challenge the alleged due process rights of a third party, i. e., Azufrera. However, it is unnecessary to reach this question. For even assuming *arguendo* that plaintiff has such standing, it must be concluded for the reasons that follow that no due process violation occurred.

We start with these considerations. First, under 19 U.S.C. § 160(a) (1970), the Tariff Commission is permitted to make such an investigation as it deems necessary and need not base its injury determination solely (or even partly) upon the record made at a hearing. Second, under the Commission's Rules of Practice and Procedure, the Commission's determination is based not only upon testimony and other evidence adduced at the hearing, but also upon such information as the Commission obtains

---

8. Plaintiff contends that pricing information could not be a trade secret in the Tampa market because by the very nature of that market a price is disclosed to the trade. Obviously, exhibit 2 was not submitted in confidence because of any *general* price information since, right after the introduction of the exhibit, a Freeport witness disclosed the prices which were available to *all* Freeport's customers in the relevant area. Exhibit 2, however, identifies the names of specific customers and discloses those instances in which a lower than prevailing price was extended to a specific customer so that the customer would not have to be released from an existing sulphur sales contract under the "meet or release" clause.

through other means. See 19 C.F.R. 201.9, 201.11(c) (1972). Third, the hearing in Investigation AA1921–92, and examination of the witnesses, was conducted according to the Commission's existing Rules of Practice and Procedure for the sole purpose of assisting the Commission in obtaining relevant and material facts with respect to the subject matter of the investigation and not in the context of an adversary proceeding. See 19 C.F.R. 201.11, 201.12(b) (1972). Fourth, under the Commission's Rules of Practice and Procedure, any oral or written evidence submitted at a hearing could, upon order of the Commission, be subject to verification from books, papers, and records of the parties submitting the evidence and from any other available source. See 19 C.F.R. 201.12(c) (1972). Fifth, the Commission's Determination of Injury was not made solely upon the record made at the hearing but after considering all written submissions from interested parties, evidence adduced at the hearing, and all factual information obtained by the Commission's staff from questionnaires, personal interviews, and other sources, in conformity with the applicable statute and the Commission's own rules. See 37 F.R. 9417, *supra.*

■ With these considerations in mind, no due process violation occurred when in the course of its investigation and fact-finding hearing in the present case, the Tariff Commission refused to permit the inspection of a confidential exhibit during cross-examination and restricted the cross-examination of a witness.

Directly relevant is *Hannah v. Larche,* 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), where the Court held that the Rules of Procedure adopted by the Commission on Civil Rights do not violate due process although they provided that the identity of persons submitting complaints to the Commission (or the contents of the complaints)

need not be disclosed and that those summoned to testify may not cross-examine other witnesses. The following findings of the Court with regard to the Commission on Civil Rights are equally applicable to the Tariff Commission (*id.* at 441, 80 S.Ct. at 1514):

\* \* \* [I]ts function is purely investigative and fact-finding. It does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property. In short, the Commission does not and cannot take any affirmative action which will affect an individual's legal rights. The only purpose of its existence is to find facts which may subsequently be used as the basis for legislative or executive action.[9]

The Court in *Hannah* continued (363 U.S. at 443–444, 80 S.Ct. at 1515):

On the other hand, the investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings, and if persons who might be indirectly affected by an investigation were given an absolute right to cross-examine every witness called to testify. Fact-finding agencies without any power to adjudicate would be diverted from their legitimate duties and would be plagued by the injection of collateral issues that would make the investigation interminable. Even a person not called as a witness could demand the right to appear at the hearing, cross-examine any witness whose testimony or sworn affidavit allegedly defamed or incriminated him, and call an unlimited number of witnesses of his own selection. \* \* \* This type of proceeding would make a shambles of the investigation and stifle the agency in its gathering of facts.

---

**9.** These findings are equally applicable to the Tariff Commission since an affirmative injury determination does not deprive anyone of his life, liberty, or property. In this case, the injury determination merely created the possibility that imported Mexican sulphur would be sub-

jected to dumping duties in the event the Customs Service determined on an entry-by-entry basis that the purchase price (or the exporter's sales price) of sulphur covered by a specific entry was less than the applicable foreign market value.

The Court also thought it highly significant that the Commission's procedures were not historically foreign to other forms of investigation (as noted in an appendix to the opinion) which have traditionally governed the proceedings of the vast majority of governmental investigating agencies (including the Tariff Commission). *Id.* at 444, 80 S.Ct. 1502.

The Court further observed (*id.* at 445–446, 80 S.Ct. at 1516–17):

The history of investigations conducted by the executive branch of the Government is also marked by a decided absence of those procedures here in issue. * * The best example is provided by the administrative regulatory agencies. Although these agencies normally make determinations of a quasi-judicial nature, they also frequently conduct purely fact-finding investigations. When doing the former, they are governed by the Administrative Procedure Act, 60 Stat. 237, 5 U.S.C. §§ 1001–1011, and the parties to the adjudication are accorded the traditional safeguards of a trial. *However, when these agencies are conducting nonadjudicative, fact-finding investigations, rights such as appraisal, confrontation, and cross-examination generally do not obtain.* [Emphasis added.]

Additionally, the Court in *Hannah* relied heavily on *Norwegian Nitrogen Products Co. v. United States, supra,* 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796, where it was held that the Tariff Act of 1922 did *not* give witnesses appearing before the Tariff Commission the right to cross-examine other witnesses testifying at Commission hearings. See 363 U.S. at 449–450, 80 S.Ct. 1502. As the Court pointed out in *Norwegian Nitrogen,* 288 U.S. at 308, 53 S.Ct. at 355–56: "Nothing in the * * * [Tariff Act of 1922] suggests belief of the lawmakers that every producer or importer is to be viewed, like a party to a lawsuit, as the adversary of every other, with the privilege of examination and cross-examination extended through the series." Similarly, nothing in the Tariff Act of 1930 suggests such right of cross-examination. Indeed, the Tariff Act of 1930 does not even require

a hearing but permits the Tariff Commission to make its determination based upon such investigation as it deems necessary.

■ The short of the matter is that due process does not necessarily require a trial-type hearing or an opportunity to confront and cross-examine witnesses. The fact is that the differences in the original and function of administrative agencies preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts. E. g., *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Hannah v. Larche, supra,* 363 U.S. at 443–444, 80 S.Ct. 1502; *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 143, 60 S.Ct. 437, 84 L.Ed. 656 (1940). Therefore, as previously indicated, when administrative agencies conduct nonadjudicative fact-finding investigations, rights such as cross-examination generally do not obtain. *Hannah v. Larche, supra,* 363 U.S. at 445–446, 80 S.Ct. 1502. Indeed, "[a]bsent constitutional constraints or extremely compelling circumstances the administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties'." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978).

Plaintiff, however, cites a number of cases which it claims supports its contention that the Tariff Commission unconstitutionally abridged the right of cross-examination. But for the reasons discussed below, none of these cases is in point.

In *Londoner v. Denver,* 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908)—the first case cited by plaintiff—the Supreme Court held that where the legislature of a state, instead of fixing the tax itself, commits to some subordinate body the duty of determining whether, in what amount, and upon whom it shall be levied, and of making its assessment and apportionment, due process of law requires that at some stage of the

proceedings, before the tax becomes irrevocably fixed, the taxpayer must have an opportunity to be heard. While an opportunity to submit in writing all objections to and complaints of the tax to the board of public works was insufficient, the Court clearly recognized that many requirements, essential in strictly judicial proceedings, could be dispensed with. A hearing, in its very essence, however, demanded that "he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof, however informal." 210 U.S. at 386, 28 S.Ct. at 714. Unquestionably, any requirements imposed by *Londoner v. Denver* were fully met in this case because Azufrera did have the right to support its allegations by argument and present proof.

*ICC v. Louisville & Nashville Railroad Co.*, 227 U.S. 88, 91, 33 S.Ct. 185, 57 L.Ed. 431 (1913)—also relied on by plaintiff—involved certain class and commodity rates established by the Interstate Commerce Commission pursuant to a statute which gave the right to a full hearing, conferred the privilege of introducing testimony, and imposed the duty of deciding in accordance with the facts proved. In that context, the Supreme Court held that all parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents, and to offer evidence in explanation or rebuttal. 227 U.S. at 93, 33 S.Ct. 185. In this case, however, the statutory scheme neither required a hearing nor limited the Tariff Commission's determination to the evidence adduced at the hearing. Rather, the statute permitted the Tariff Commission to conduct such investigation as it deemed necessary.

Moreover, the Supreme Court in *Norwegian Nitrogen Products Co. v. United States, supra*, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796, made clear that the holding in the *Louisville & Nashville* case mandating the right of cross-examination at an ICC adjudicatory hearing was not applicable to a Tariff Commission investigative hearing. *Norwegian Nitrogen* involved a claim that a duty assessment was invalid because the Tariff Commission, in investigating the costs of production for purposes of the flexible tariff provisions of the Tariff Act of 1922, had not given the petitioner the hearing prescribed by the statute.[10] After an extensive review of the statute, legislative history, and past practice of the Commission, which had been acquiesced in by Congress, the Supreme Court in *Norwegian Nitrogen* specifically rejected the applicability of past cases (such as *ICC v. Louisville & Nashville Railroad Co.*) in which the word "hearing" as applied to administrative proceedings had been thought to have a "broader" meaning. The Court stated (288 U.S. at 317–318, 53 S.Ct. at 359):

We are not unmindful of cases in which the word "hearing" as applied to administrative proceedings has been thought to have a broader meaning. All depends upon the context. There is no denial of the power of Congress to lay bare to the business rivals of a producer and indeed to the public generally every document in the office of this Commission and all the information collected by its agents. The question for us here is whether there was the will to go so far. The answer will not be found in definitions of a hearing lifted from their setting and then applied to new conditions. The answer will be found in a consideration of the ends to be achieved in the particular conditions that were expected or foreseen. * * * Much is made by the petitioner of the procedure of the Interstate Commerce Commission when regulating the conduct or the charges of interstate carriers, and that of the Public Services Commissions of the states when regulating the conduct

---

**10.** While the importer's counsel had been allowed to cross-examine the president of the domestic producer as to everything brought out at the public hearing, he had not been allowed to extract from the witness a statement of costs of production. Counsel's subsequent demands for inspection of every particular of evidence gathered by the Commission or its representatives and for examination of any and all witnesses, including the Commission's field agents, were refused.

or the charges of public service corporations. The Tariff Commission advises; these others ordain. * * * Whatever the appropriate label, the kind of order that emerges from a hearing before a body with power to ordain is one that impinges upon legal rights in a very different way from the report of a commission which merely investigates and advises. The traditional forms of hearing appropriate to the one body are unknown to the other. * * *

With respect to the statute itself, i. e., the Tariff Act of 1922, the Supreme Court (as previously indicated) held in *Norwegian Nitrogen* that nothing in the statute suggested a belief of the lawmakers that every producer or importer was to be viewed, like a party to a lawsuit, as the adversary of every other, with the privilege of examination and cross-examination extended through the series. 288 U.S. at 308, 53 S.Ct. 350. Also, as previously indicated, the statute before this court, i. e., the Tariff Act of 1930, does not even require a hearing, but permits the Tariff Commission to make its determination based upon such investigation as it deems necessary. Thus, Congress obviously did not intend that every producer or importer appearing at an optional hearing be viewed as the adversary of every other, with the privilege of unlimited examination and cross-examination.

Plaintiff relies further on *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) and *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) to support its position that the Tariff Commission violated due process in its restriction of cross-examination in the two instances previously noted. See p. 212, *supra*. However, neither case changed the law with regard to purely investigative and fact-finding proceedings conducted by agencies such as the Tariff Commission.[11] *Greene v. McElroy* held that in the absence of explicit authorization from either the President or Congress, the Secretaries of the Armed Forces were not authorized to deprive petitioner of his job in a security clearance proceeding in which he was not afforded the right of confrontation and cross-examination. But as pointed out in *Hannah v. Larche, supra*, 363 U.S. at 452, 80 S.Ct. at 1520: "The various Security Clearance Boards involved in *Greene were not conducting an investigation* ; they were determining whether Greene could have a security clearance—a license in a real sense, and one that had a significant impact upon his employment." (Emphasis added.) Here by contrast, the Tariff Commission was conducting a nonadjudicative fact-finding investigation.

In *Goldberg v. Kelly*, the Supreme Court held that welfare recipients could not be deprived of welfare benefits without a hearing with opportunity to confront and cross-examine adverse witnesses. However, in *Mathews v. Eldridge, supra*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, the Supreme Court later held that due process did not require an evidentiary hearing prior to the termination of social security disability payments and observed that *Goldberg* was the only case in which the Court had held that a hearing approximating a judicial trial was necessary. 424 U.S. at 333, 96 S.Ct. 893. Also the Court in *Mathews* reiterated that due process is flexible and calls for such procedural protections as the particular situation demands and then stated (424 U.S. at 334–335, 96 S.Ct. at 903):

* * * [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, includ-

11. *Appalachian Power Co. v. EPA*, 477 F.2d 495 (4th Cir. 1973), also relied upon by plaintiff, adds nothing since there the court basically stressed the need for an appropriate type of hearing. However, in appropriate circumstanc- es the opportunity for informal consultation with designated personnel could meet the due process requirements. See, e. g., *Goss v. Lopez*, 419 U.S. 565, 581–584, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

ing the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. * * *

In this setting, the Court in *Mathews* concluded that the private interest that would be adversely affected by an erroneous termination of benefits was likely to be less in the case of a disabled worker than in the case of a welfare recipient in view of other forms of government assistance available to the terminated disabled recipient and that there was therefore less reason than in *Goldberg* to depart from the ordinary principle that something less than an evidentiary hearing is sufficient prior to adverse administrative action.

█ Measuring the foregoing three factors set out in *Mathews* against the consideration specified in *Hannah*, it must be concluded that the requirement in *Goldberg* for a hearing approximating a judicial trial, with right of confrontation and cross-examination, is simply not applicable to the Tariff Commission hearing here involved.

*Whether the Commission's Determination of Injury was Arbitrary or Capricious*

Lastly, plaintiff contends that on the basis of the record of the Commission transmitted to the court, the Commission's determination of injury was arbitrary, capricious, an abuse of discretion and not according to law for the following reasons:

1. The Commission, in its determination altogether failed to discuss (a) Duval's role, as a new entrant, as the likely reason for the price depression in Tampa; (b) why the announced price increase in early 1972 did not hold at a time when Azufrera had withdrawn from the Tampa market;[12] (c) the

12. According to the plaintiff, "[i]t seems almost unanswerable that, if Azufrera caused the price decrease from $27 to $25, as found by the Tariff Commission, then the price should have moved upward when the domestic producers announced a price increase in early 1972 at a time when Mexican sulphur was not being sold."

13. In this connection, plaintiff points out that the Antitrust Division of the Department of Justice—which appeared as a party at the Commission hearing—discussed at length the

basis upon which the Commission found that LTFV sales had injured or were likely to injure the domestic industry in the East Coast market; and (d) why injury, if any, was not *de minimis*.

2. The Commission committed an error of law because it allegedly equated LTFV sales and offers with injury.

With respect to Duval, plaintiff argues more particularly as follows:

Specifically, the Commission failed to address the entry of a new, major marketer, DuVal, in 1969, whose Tampa shipments in 1969–1971 totaled 624,237 long tons, as compared with Azufrera * * shipments of 259,520 tons [sic] in the same period. * * * Further, the Commission had evidence that the price depression in the Tampa market was caused by DuVal's entry. DuVal clearly initiated price decreases to $32 and then to $30. * * * There was also evidence before the Commission—undersigned counsel was unaware of it at the time—that offers in the range of $25 to $27 were being made by June 1970. Confidential Exh. 2, p. 5, June 26 entry. Further, based on Confidential Exh. 2, the $25 offer (*i. e.*, $5 below $30) appears to have been a DuVal offer, since the October 20, 1970 entry shows Azufrera's price was $27. Since price depression was a crucial issue, and the impact of DuVal's entry was brought to the attention of the Commission, we fail to see how a rational statement of reasons can pin responsibility for price depression on offers of Mexican sulphur without at least making a reasoned statement as to why the new entrant, DuVal, was not responsible, responsible only in part for the price depression.[13] * * *

importance of Duval's entry in creating a condition of oversupply and causing price depression, and argued that the coincident factors of massive oversupply and the entry of Duval, a major new supplier in the domestic market, caused a serious price break. In the Antitrust Division's view, "[i]t is thus clear that the price reductions complained of are the results of factors unrelated to the LTFV margins found and do not support a finding of injury for want of the necessary causal connection * * *."

With respect to the East Coast market, plaintiff takes the following position:

> The shipments upon which the duties have been paid and are the subject of Pasco's complaint for refund are east coast shipments. There was no evidence adduced at the hearing that Azufrera or Pasco had engaged in any assertedly disruptive market activity in connection with sales to east coast customers. * * The Commission cites not a shred of evidence in its opinion. Indeed, the Commission notes that prices along the east coast declined about 40%, where Mexican sulphur is sold, and about 40% in north-central states, where Mexican sulphur is not sold. On the face of the Commission's decision, it seems obvious that general market conditions not related to Mexican sulphur were responsible for the price decline on the east coast. * * * The Commission has not explained, in any way, how Azufrera's marketing practices injured domestic competitors on the east coast, and its decision in this regard is not rational.

And with respect to its contention that injury, if any, was only de minimis, plaintiff states:

> At the hearing, Azufrera's posture was that all offers made by it were at prevailing prices, as reported to it by its customers. * * * Azufrera introduced numerous letters showing that it had been besieged by customer requests to lower prices to meet competitive offers. * * It was clear that Azufrera had not been using price depression to gain sales. * * Azufrera's share of the Tampa market fell as prices fell. Azufrera's east coast sales had also fallen. * * * The evidence was uncontradicted that prices had fallen [sic] in U.S. markets where Mexican sulphur was sold by an [sic] much or more as in Tampa and along the east coast. * * * As seen, the domestic industry was unable to sustain an announced price increase in Tampa after Azufrera had withdrawn Mexican sulphur from the market. There was credi-

ble, expert testimony that Azufrera, with the smallest market shares in Tampa and along the east coast, would have the least influence on price. * * * Other factors readily explained the reasons for the price depression, including the potential entry of Canadian sulphur. DuVal as a new entrant, and the availability of recovered sulphur from nearby Caribbean and U.S. sources as a growing source of supply. * * * Finally, as the sulphur market became oversupplied, Mexican production of Frasch sulphur was curtailed by 19%, whereas U.S. production fell about 5%. * * * The far more substantial curtailment by the Mexican industry would tend to negate a finding of injury or likelihood of injury.

> In the foregoing circumstances, injury, if any, caused by LTFV offers was de minimis. On the assumption that Azufrera had made lower offers on its own initiative, as alleged, the Department of Justice, crediting the testimony of * * [an Azufrera expert] argued that the injury was de minimis "[b]ecause the price in Tampa would have reached $25 in 1971 regardless of whether there were Mexican sales—at LTFV or otherwise— . . . ." * * *

The Commission conceded that "significant injury" had to be shown. However, the Commission failed to make a rational determination that there could be significant injury because it failed to address the foregoing factors, all of which were in evidence before the Commission and stressed in briefs filed with the Commission.

Against the background of these contentions, plaintiff insists that the Commission, in reaching its affirmative injury decision, was obliged to discuss the foregoing relevant facts; that these relevant facts could not be ignored in any rational discussion of the Tampa market in 1969–1971; that the Commission did not take these facts into account in reaching its injury decision; and that as a consequence, the Commission decision was arbitrary and capricious.

As underpinning for this argument, plaintiff relies on *Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975) which, it says, requires that a rational statement of reasons must address relevant facts. In *Bachowski,* a candidate for election to a union office, after being defeated, filed a complaint with the Secretary of Labor alleging violations of the Labor-Management Reporting and Disclosure Act of 1959, thus invoking a provision of that Act which requires the Secretary to investigate the complaint and decide whether to bring a civil action to set aside the election. The Secretary upon investigation decided that such action was not warranted and advised the complainant that "[b]ased on the investigative findings, it has determined \* \* that civil action to set aside the challenged election is not warranted." The Court held that in order to enable the reviewing court intelligently to review the Secretary's decision and determine whether or not it was arbitrary or capricious, it was necessary for the Secretary to provide the court and the complaining witnesses with copies of a statement of reasons *supporting* his decision; and that it was necessary for him to delineate and make explicit the basis upon which discretionary action was taken. A "reasons" requirement, the Court stated, promotes thought by the Secretary and compels him to cover the relevant points and eschew irrelevancies. However, the Court did not impose a requirement that the statement must discuss reasons in opposition to the determination (or that it must be more detailed and more specific than the determination and statements of reasons in this case). That the Court only intended the inclusion of *supporting* reasons sufficient to explain the basis of the decision is obvious from its quotation from a prior case to the effect that if there is a rational and defensible basis stated in the reasons statement for the Secretary's determination, then that should be an end of the matter, for it is not the function of the courts to determine whether or not the case should be brought or what its outcome should be. 421 U.S. at 573, 95 S.Ct. 1851.

Against the backdrop of these considerations, examination of the Tariff Commission's Determination of Injury (including the Statement of Reasons for the Affirmative Determination of Chairman Bedell and Commissioners Sutton and Moore and the separate Statement of Reasons for the Affirmative Determination of Commissioners Leonard and Young) makes it plain that the determination in its entirety presents a rational and defensible basis for the Commission's unanimous determination that an industry in the United States is being injured by reason of the importation of elemental sulphur from Mexico that is being or is likely to be sold at less than fair value within the meaning of the Antidumping Act. See 37 F.R. 9417.

█ The Commission's Statements of Reasons adequately cover not only the requisite legal inquiries but also the facts supporting the Commission's conclusions as to injury and causation. The Commission was "under no obligation either to disclose all of the evidence in its possession nor to state in meticulous detail exactly on what basis it applies that evidence in determining injury or likelihood thereof." *City Lumber Co. v. United States,* 457 F.2d 991, 59 CCPA 89, 95, C.A.D. 1045 (1972).

█ What is more, the applicable statute (19 U.S.C. 160(a) (1970)) permitted the Tariff Commission to make such investigation as it deemed necessary and merely required the Commission, upon making its determination, to publish such determination in the Federal Register, with a statement of the reasons therefor. 19 U.S.C. 160(c) (1970). The statute contained no requirement, such as contained in 5 U.S.C. 557(c) (1970), that the agency must rule on each finding, conclusion, or exception presented by any party appearing before it and must include in its decision a statement of findings and conclusions, and the reasons or bases therefor, on all the material issues of fact, law, or discretion presented on the record.

As seen from the determination itself (37 F.R. 9417) as well as from a summary of its more salient points (which appears in an earlier part of this opinion), the Commission

discussed at considerable length its findings and conclusions as well as statements of the reasons for the affirmative injury determination. Thus, the Commission clearly met its statutory obligations to state the reasons in support of its findings. The statute did not require more.[14]

Further, it is evident from the Statement of Reasons of Commissioners Leonard and Young that the Commission correctly construed the applicable law. See 37 F.R. 9418. Thus, this statement rightly concluded that the Antidumping Act required that the Commission find two conditions satisfied before an affirmative determination could be made: First, there must be injury, or likelihood of injury, to an industry in the United States; and second, such injury (or likelihood of injury) must be "by reason of" the importation into the United States of the class or kind of foreign merchandise the Secretary of the Treasury determined was being or was likely to be sold at less than fair value.[15]

As to the first condition, the Commission found, on the basis of its investigation, that an industry in the United States (consisting of the domestic facilities of U.S. producers devoted to the mining, recovery, and distri-

bution of sulphur) was being injured because the industry, with large investment in the production of sulphur, had been forced to curtail exploration, shut down facilities, lay off workers, and had found its before-tax profits on sulphur operations substantially reduced. 37 F.R. 9417, 9418. These findings are supported by evidence adduced at the hearing. See transcript of proceedings before the Commission (hereafter "tr.") 26, 32, 39–41, 78–81, 290–292, 297–298, 302, 323.

As to the second condition, the Commission found that there was causation between LTFV imports of Mexican sulphur and the injury to domestic industry because its investigation had revealed that LTFV sales and offers of Mexican sulphur had contributed to the general depression of prices and to market disruption in Tampa and along the East Coast of the United States.[16] In fact, a part of the price depression undergone by the domestic sulphur industry since 1968 and part of the market disruption in Tampa was directly tied to sales and offers of Mexican sulphur at less than fair value. See 37 F.R. 9418. Again, these findings are supported by evidence adduced at the hearing.[17]

---

**14.** In the Trade Act of 1974, Congress amended 19 U.S.C. 160(c) to provide that the Commission, upon making its determination, "shall publish in the Federal Register such determination, whether affirmative or negative, together with a complete statement of findings and conclusions, and the reasons or bases therefor, on all the material issues of fact or law presented (consistent with confidential treatment granted by the * * * Commission, * * * in the course of making its determination)." See 19 U.S.C. 160(d)(2) (1976).

**15.** Section 201(a) of the Antidumping Act (19 U.S.C. 160(a) (1970)) required the Commission to determine "whether an industry in the United States is being or is likely to be injured * * by reason of the importation of * * * [LTFV] merchandise into the United States." (Emphasis added.)

**16.** The Tampa and the East Coast areas of the United States are major sulphur market areas which together account for 40% of the sulphur consumed in the United States. They are separate and distinct from other sulphur consuming markets in the United States because they can only be served by deepwater vessels. Since Mexican sulphur imports can only enter by

deepwater vessels, they compete with the domestic industry only in these markets. Tr. 228–230, 237–238. Thus, by considering the Tampa and the East Coast markets, the Commission clearly considered the relevant market for purposes of determining whether an American industry was injured "because of" LTFV imports of Mexican sulphur.

For logistical reasons, no foreign sulphur other than Mexican sulphur has been entering either the Tampa or the East Coast market. See tr. 227–239, 287–289.

**17.** Thus there was evidence before the Commission that both Duval and TGS had lost sales to Azufrera's LTFV sulphur. Tr. 347–348, 404–406. There was also evidence that Freeport had not lost sales to Azufrera because it had preferred to meet the LTFV offers, which were lower than the prevailing prices, rather than to lose substantial quantities of sales particularly in the Tampa area. See tr. 116–120. Testimony indicated that Duval and TGS had not lost sales to a *domestic* company under the "meet or release" provisions of the sulphur contracts. Tr. 296, 405–406. Duval and Freeport attributed the price depression during 1970–1971 primarily to Azufrera's LTFV sales and offers (e.

It is therefore apparent from its determination that the Commission properly employed criteria which are relevant to the determination as to whether "injury" or "likelihood of injury" in fact existed. The relative weight it gave to those criteria was a matter of discretion and expert judgment.

In sum, the determination · and statements of reasons covered all the relevant points and showed a rational and defensible basis for the affirmative determination. Accordingly, the determination must be upheld. For it is basic that having been delegated discretionary authority by the Congress, the Commission's determination may not be disturbed by the court when, as here, it had a rational basis in fact and was not contrary to law. See, e. g., *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Suwannee Steamship Co. v. United States*, 435 F.Supp. 389, 79 Cust.Ct. 19, 23–24, C.D. 4708 (1977). And since the Commission has been delegated discretionary authority, it is not the function of the court to weigh the evidence considered by the Commission, determine the credibility of the witnesses appearing at the hearing and substitute its judgment for that of the Commission; indeed, the Commission decision, if rational and not contrary to law, must be upheld by the court even though that decision is not one the court would have reached had the question first arisen

in judicial proceedings. See, e. g., *Imbert Imports, Inc. v. United States*, 475 F.2d 1189, 60 CCPA 123, 127, C.A.D. 1094 (1973); *City Lumber Co. v. United States*, 311 F.Supp. 340, 64 Cust.Ct. 826, 832, 834, A.R.D. 269 (1970), *aff'd*, 457 F.2d 991, 59 CCPA 89, *supra*.

In view of these and the following considerations, the court cannot agree with plaintiff's arguments to the effect that the Commission determination is not rational because it failed to discuss: Duval's role as a new entrant in the sulphur market; the 1972 "abortive" increase in sulphur prices; how Azufrera's marketing practices injured domestic competitors on the East Coast; and why the injury was not *de minimis*.

More specifically, as to Duval's role as a new entrant in the sulphur market, so long as there was a causative link between Azufrera's LTFV sales and offers and the injury to domestic industry, the Commission was correct in finding injury to domestic industry "by reason" of these LTFV sales and offers. To establish the necessary causation, LTFV sales do not have to be the sole cause, the major case, or greater than any other single cause of injury. Hence, once the Commission found a causative link between LTFV sales and offers and injury to domestic industry, its task in this respect was finished.[18] It simply had no reason to

---

g., tr. 101, 363), and specific instances of price reductions caused by such offers and sales were cited by Freeport. See tr. 116–120 and exhibit 2.

**18.** Section 201(a) of the Antidumping Act (19 U.S.C. § 160(a) (1970)) which has a "by reason of" injury test should be contrasted with section 201(b) of the Trade Act of 1974 (19 U.S.C. § 2251(b) (1976)), which requires the Commission to determine whether an article is being imported into the United States in such increased quantities as to be a *substantial* cause of *serious* injury, or the threat thereof. It is further to be noted that the Commission's view regarding cause of injury for antidumping purposes has been subsequently endorsed by the Senate Finance Committee in connection with the Trade Act of 1974. S.Rep.No.93–1298, 93d Cong., 2d Sess. (1974) U.S.Code Cong. & Admin.News 1974, pp. 7186, 7316. That report stated (*id.* at 180):

* * * Under the Antidumping Act, the Commission determines whether a domestic industry "is being or is likely to be injured, or is prevented from being established, by reason of the importation of" the less-than-fair-value imports. The term "injury," which is unqualified by adjectives such as "material" or "serious," has been consistently interpreted by the Commission as being that degree of injury which the law will recognize and take into account. Obviously, the law will not recognize trifling, immaterial, insignificant or inconsequential injury. Immaterial injury connotes spiritual injury, which may exist inside of persons not industries. Injury must be a harm which is more than frivolous, inconsequential, insignificant, or immaterial. Moreover, the law does not contemplate that injury from less-than-fair-value imports be weighed against other factors which may be contributing to injury to an industry. The words "by reason of" express a causation

discuss the other causes which had contributed to the injury, be it Duval's entrance as a major producer or some other factor. In short, when the Commission found that the LTFV sales and offers of Mexican sulphur had contributed to the general depression of prices and to market disruption in Tampa and along the East Coast of the United States, it in effect, found that Duval was not the sole cause of injury.[19]

■ Furthermore, contrary to plaintiff's argument, the Commission's determination in its entirety (including both statements of reasons) that the LFTV sales and offers of Mexican sulphur had contributed to the general depression of prices and to market disruption is supported by evidence adduced at the hearing.[20] For there was ample evidence presented to the Commission showing that Azufrera (with its sales and offers of LTFV sulphur below the prevailing prices) was responsible for at least part of the $7 per ton reduction in the Tampa sulphur prices during the period 1970–1971. See, e. g., tr. 101, 116–120, 363, 404–406.

We turn now to plaintiff's argument as to the 1972 abortive price increase. As previously indicated, plaintiff contends that the fact that this increase did not hold at a time when Azufrera had withdrawn from the market makes it almost unanswerable that Azufrera could not have caused the price decrease from $27 to $25 a ton in 1971. For according to plaintiff, if Azufrera had caused the price decrease, then the price

should have moved upward when it withdrew from the market. But given the facts that there was testimony before the Commission that Mexico had a large unused surplus capacity (tr. 34–35), that Azufrera could have returned to the United States market place,[21] which it had left only because of the threat of dumping duty assessments (tr. 525–526, 528), that the antidumping proceedings had not been concluded, and that customers apparently believed that they could purchase sulphur at the "old price" (tr. 283), the failure of the 1972 price increase to "stick" was quite understandable.

■ Plaintiff's next argument is that there was no evidence adduced at the hearing that Azufrera had engaged in any disruptive activity in connection with sales to East Coast customers albeit dumping duties were assessed on East Coast shipments. But this argument overlooks the principle that under the Antidumping Act, a national industry may be injured if injury is experienced in only a portion of its market. See *Imbert Imports, Inc. v. United States, supra,* 475 F.2d 1189, 60 CCPA at 127; *Ellis K. Orlowitz Co. v. United States,* 50 CCPA 36, 40–42, C.A.D. 816 (1963). Once an injury is found *anywhere,* the Constitution itself requires that any resulting dumping duties be uniformly assessed throughout the United States, wherever the merchandise is entered. Therefore, even if the Commission had found that injurious

link but do not mean that dumped imports must be a (or the) principal cause, a (or the) major cause, or a (or the) substantial cause of injury caused by all factors contributing to overall injury to an industry.

**19.** Inasmuch as Azufrera's LTFV sales were more than insignificantly responsible for the price depression, the Commission was correct in concluding that they were a source of remediable injury to the domestic industry.

**20.** Plaintiff refers to the brief submitted by the Antitrust Division to the Commission and contends that the Department of Justice "found" that there could be no causative link between asserted Azufrera LTFV margins and the then present prices. However, the only relevant findings are those of the Commission. The statute charged the Commission, not the Antitrust Division, with determining whether a do-

mestic industry was injured because of the LTFV sales or offers. This the Commission did. And, as stated before it is not the function of the court to weigh and balance the evidence in the same manner as the Commission. *Imbert Imports, Inc. v. United States, supra,* 475 F.2d 1189, 60 CCPA at 127.

Moreover, the Antitrust Division recognized that it did not possess all of the facts because it specifically noted in its brief (pp. 10–11) that the Commission had Duval's confidential list of customers gained in the period in question which should give it a basis for assessing the market dislocations caused by Duval's entry.

**21.** According to the testimony, Azufrera's sulphur can reach Tampa in a week or less. Tr. 555.

events occurred only in Tampa, dumping duties still would have been properly assessed on merchandise entered on the East Coast.

There is the further consideration that there was considerable evidence about the "ripple" or "spill-over" effect of price reductions in the Tampa area into the East Coast area. See, e. g., tr. 36–37, 68–70, 278–279, exhibits 2 and 3. In that circumstance, the Commission's additional finding that LTFV sales and offers of Mexican sulphur had also contributed to the general depression of prices and to market disruption along the East Coast of the United States was clearly warranted.

This brings us to plaintiff's contention that injury, if any, was only *de minimis.* As previously indicated, plaintiff argues that at the hearing Azufrera's posture was that all offers made by it were at prevailing prices and that it was clear that Azufrera had not been using price depression to gain sales. However, there was substantial evidence before the Commission to the effect that the actual price reduction in Tampa was due to LTFV sales and offers of Azufrera sulphur at *lower* than the prevailing prices; that such sales or offers reduced that the prices in Tampa (as well as in the East Coast market due to the "ripple" or "spill-over" effect); and that such LTFV sales led to a loss of revenue. Tr. 36–37, 68–70, 113–114, 278–279, exhibits 2 and 3.[22]

Plaintiff's final contention is that the Commission made an error of law because it allegedly equated LTFV sales and offers with injury. As support for this position, plaintiff relies on the following sentence contained in the Statement of Reasons for Affirmative Determination of Chairman Bedell and Commissioners Sutton and Moore (37 F.R. 9418): "When price sensitivity reaches the degree which characterized

the U.S. sulphur market in and since 1969, LTFV sales and offers would almost inevitably cause an injurious impact." But as seen from their statement of reasons, these Commissioners first noted specifically that the investigation had revealed that the LTFV sales and offers of Mexican sulphur had contributed to the general depression of prices and to market disruption in Tampa and along the East Coast of the United States. 37 F.R. 9417. They then proceeded to discuss the various factors involved (such as the economic conditions in the domestic industry, the extent of the LTFV sales and offers, and price depression and market disruption) in greater detail. It is in the context of discussing the extent of LTFV sales and offers that these Commissioners stated that "[w]hen price sensitivity reaches the degree which characterized the U.S. sulphur market in and since 1969, LTFV sales and offers would almost inevitably cause an injurious impact." 37 F.R. 9418. In so doing, it is apparent that they were not equating injury for purposes of the Antidumping Act with LTFV sales and offers, because they had already determined that LTFV sales and offers had contributed to the general depression of prices and to market disruption.

### Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted; plaintiff's cross-motion for summary judgment is denied; and the action is hereby dismissed.

---

**22.** As set out previously in this opinion, there was evidence before the Commission that Azufrera was responsible for initiating price

decreases in the Tampa market in a number of specific instances.