**JEANNETTE SHEET GLASS CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Crystal International Corporation, and Flachglas A.G., Intervenors,**

**Glaverbel, S.A., Intervenor,**

**Erie Scientific Company, A Division of Sybron Corporation, and Erie-Electroverre, S.A., A Wholly Owned Subsidiary of Sybron Corporation, Intervenors.**

Court No. 83–5–00729.

United States Court of International Trade.

March 22, 1985.

Stewart & Stewart, Washington, D.C., Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Charles A. St. Charles, Sp. Counsel, Washington, D.C., for plaintiff.

Michael P. Mabile, Acting General Counsel and Catherine R. Field, Office of General Counsel, United States International Trade Commission, Washington, D.C., for defendant.

Mudge Rose Guthrie Alexander & Ferdon, Washington, D.C. (N. David Palmeter, David P. Houlihan, Washington, D.C., and Alan H. Price, of counsel), for intervenors Crystal International Corporation and Flachglas A.G.

Ulmer, Berne, Laronge, Glickman & Curtis, Cleveland, Ohio (Morton L. Stone and

Ronald H. Isroff, Cleveland, Ohio, of counsel), for intervenor Glaverbel, S.A.

Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N.Y. (Victor T. Fuzak, Anthony L. Dutton and Craig M. Indyke, Buffalo, N.Y., of counsel), for intervenors Erie Scientific Company and Erie-Electroverre, S.A.

Max N. Berry, Washington, D.C. (Marsha A. Echols, Washington, D.C., of counsel), for amicus curiae Donnelly Corporation.

BERNARD NEWMAN, Senior Judge:

### Introduction

By this action, plaintiff challenges the preliminary negative determinations of the International Trade Commission ("Commission") issued in antidumping investigations pursuant to 19 U.S.C. § 1673b(a). In the preliminary determinations under review the Commission found there was no "reasonable indication" that plaintiff, Jeannette Sheet Glass Corporation ("plaintiff" or "Jeannette"), the sole domestic producer of thin sheet glass, is materially injured or threatened with material injury by reason of imported "regular quality" thin sheet glass from Switzerland, Belgium or the Federal Republic of Germany; and that plaintiff is not materially retarded in the establishment of a "high quality" thin sheet glass industry by reason of imports of such glass from Belgium or the Federal Republic of Germany. *Thin Sheet Glass from Switzerland, Belgium and the Federal Republic of Germany*, Inv. Nos. 731–TA–127, 128 and 129 (Preliminary), USITC Pub. No. 1376 (May 1983). In view of the negative determinations, the antidumping investigations were terminated and notice of such termination was published on May 11, 1983 (48 Fed.Reg. 21213 (1983)).

Plaintiff seeks review of the Commission's preliminary determinations upon the agency's record pursuant to Rule 56.1 of the rules of the Court, and presents basically three contentions:

1) The Commission's determinations are not in accordance with the "reasonable indication" standard as articulated in *Republic Steel Corp. v. United States*, 8 CIT ——, 591 F.Supp. 640 (July 11, 1984), *reh'g denied*, 9 CIT ——, Slip Op. 85–27 (March 11, 1985).

2) The determinations with respect to regular quality thin sheet glass are arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

3) The determinations respecting material retardation of the establishment of a domestic high quality thin sheet glass industry are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

For the reasons that follow the case is remanded to the Commission for reconsideration of its preliminary negative determinations as to material injury or the threat of material injury to an industry in the United States producing regular quality thin sheet glass in compliance with the standard of review articulated in *Republic Steel Corp., supra.* The Commission's preliminary negative determinations respecting material retardation of the establishment of a high quality thin sheet glass industry in the United States are affirmed.

### Background

On March 16, 1983 Jeannette filed a petition with the Commission and the Department of Commerce alleging that imports of thin sheet glass from Switzerland, Belgium and the Federal Republic of Germany are being sold in the United States at less than fair value ("LTFV"), and that as a result the domestic industry producing thin sheet glass (*viz.*, Jeannette) is materially injured or threatened with material injury. The petition distinguished between the "regular quality" thin sheet glass that Jeannette produced, used primarily in the production of microscope slides, cosmetic mirrors, and lantern slides for slide projectors, and "high quality" thin sheet glass, used primarily as optical coating glass for instrumentation having light emitting diodes or liquid crystal display, and for photographic slide glass. On April 6, 1983 Jeannette amended its petition to allege that LTFV

imports of high quality thin sheet glass from Belgium and the Federal Republic of Germany are retarding the establishment of a high quality thin sheet glass industry in the United States.

On April 27, 1983, after conducting its preliminary investigations, the Commission (Chairman Alfred Eckes and Commissioner Veronica A. Haggart; Commissioner Paula Stern dissenting in part) determined that there is no reasonable indication that the domestic regular quality thin sheet glass industry (*viz.*, Jeannette) is materially injured or threatened with material injury by reason of imports of regular quality thin sheet glass from Switzerland, Belgium or the Federal Republic of Germany, allegedly sold at LTFV. Additionally, the Commission unanimously found there is no reasonable indication that the establishment of a high quality thin sheet glass industry in the United States is being materially retarded by reason of imports of high quality thin sheet glass from Belgium or the Federal Republic of Germany, allegedly sold at LTFV.[1] Material retardation was not alleged concerning Switzerland because that country does not export high quality thin sheet glass to the United States.

Jeannette commenced this action on May 17, 1983 challenging the Commission's negative determinations. Pursuant to Rule 56.1(a) of the Rules of the Court, Jeannette filed on May 29, 1984, a motion for an order directing that this matter be submitted for review upon the agency record. On July 17, 1984, this Court granted Jeannette's motion. Thereafter on August 7, 1984, Jeannette filed the present motion together with a supporting memorandum; and on August 15, 1984 the Commission moved for a stay of this action pending a decision on a motion for reconsideration to be filed in *Republic Steel, supra,* or a decision on appeal in that case.

On October 4, 1984, the Commission filed a motion for reconsideration in *Republic Steel* of that portion of Judge Watson's

decision relating to the "reasonable indication" standard applicable to the Commission's preliminary investigations. Plaintiffs in *Republic Steel* also requested reconsideration of the issue of cumulation. The Commission's motion for a stay of the present proceeding was denied by this Court on October 2, 1984. The Commission's motion for reconsideration in *Republic Steel* was denied by Judge Watson on March 11, 1985. 9 CIT ——, Slip Op. 85–27.

Following the submission of briefs on plaintiff's motion for review in the present case, oral argument was heard on January 17, 1985.

*Commission's Determination that there is No Reasonable Indication of Material Injury or Threat of Material Injury to the Regular Thin Sheet Glass Industry*

We first review the Commission's preliminary determinations respecting material injury or threat of material injury to the regular quality thin sheet glass industry.

*Commission's findings*

Jeannette, wholly owned by its employees and managers, began producing thin sheet glass in March 1980 when it reopened a plant formerly owned by ASG, Inc. and Fourco Glass Co., which was shut down in November 1978. The former employees of ASG provided capital, and with government guarantees and additional funds from private lenders, purchased the plant and refurbished it.

The Commission also found:

1. Throughout the period of investigation, production of regular quality thin sheet glass was profitable and the profits remained comparatively stable.

2. Domestic production, shipments and capacity utilization rose from 1980 to 1981, but then declined from 1981 to 1982.

3. Employment remained stable and hours worked increased from 1980 to 1981,

---

**1.** The Commission made separate determinations concerning regular quality and high quality thin sheet glass. Commissioner Stern dissented only with respect to regular quality thin sheet glass, finding that there is a reasonable indication of material injury.

but both factors declined from 1981 to 1982.

4. Inventories of regular quality thin sheet glass increased throughout the period under investigation.

In determining whether the "difficulties" experienced by the domestic industry were caused by the alleged LTFV imports, the Commission considered, among other things, underselling by the imports, lost sales, and price suppression resulting in lost revenues. In instances where there was underselling by the imports, the majority Commissioners found the margin of underselling "minimal". Lost sales and revenues were attributed to the lower quality of the domestic product, and the majority found that price was not a determinative factor.

Pertaining to threat of material injury, the Commission majority found in the negative on the basis of the limited productive capacity or high levels of capacity utilization of the exporters (Erie-Electroverre of Switzerland; Glaverbel of Belgian; and Flachglas, the West German firm). The Commission majority also noted the absence of plans by the exporters to expand shipments to the United States.

*Dissenting Commissioner Stern's views*

Commissioner Stern found that Jeannette is currently experiencing economic difficulties with respect to the regular quality thin sheet glass product, as did the majority commissioners. Specifically, Commissioner Stern pointed to the evidence of record that domestic production, shipments, capacity utilization, employment and sales of thin sheet glass declined substantially between 1980 and 1982; that operating income, net income, and cash flow followed a similar downward trend. Further, Commissioner Stern observed that Jeannette's share of the domestic market for regular quality thin sheet glass, while small relative to the imports, is declining. In contrast to the foregoing fact, Commissioner Stern found that the respective market shares held by the imports from Belgium and West Germany had grown, and Switz-

erland's market share—which is significant—has remained relatively stable.

While conceding that "the information on the record is mixed", Commissioner Stern found indications that the imports from Belgium and Switzerland have undersold the domestic product, particularly in 1982, and that many purchasers have shifted their sourcing from the domestic producer to each of the imports under investigation. As perceived by Commissioner Stern, "[t]he key issue in this investigation has been whether this shift occurred solely due to alleged quality problems with the domestically produced product". USITC Pub. No. 1376 at p. 24. On this crucial aspect of the investigations, Commissioner Stern concluded, but not definitively, that the quality issue alone does not explain why customers shifted from Jeannette to the imports. In that connection, it was pointed out by the dissent that while quality is clearly an important factor, the parties to the investigation agreed that both price and the quality of the product are important considerations in the purchasing decision; that increased yield resulting from the use of a product of good quality may offset the greater price of the better quality product; and that quality did not constitute a problem for at least two customers contacted by the Commission staff.

Finally, Commissioner Stern observed that LTFV margins may be used, in effect, to underwrite a smaller quality premium than the market would otherwise generate, and determined that "there is reasonable indication that such a situation is present in each of these investigations before us." *Id.* at 26. In sum, Commissioner Stern was not able to "discount the possibility that LTFV sales of the imports have materially injured the domestic industry". *Id.* at 26.

*"Reasonable indication" standard*

The Court now reaches plaintiff's contention that the Commission misapplied the "reasonable indication" standard prescribed by 19 U.S.C. § 1673b(a) by weighing conflicting evidence of record. In support of its position, plaintiff relies upon *Republic Steel*, where Judge Watson held

that in a preliminary, unlike a final, investigation the Commission may not weigh conflicting evidence and determine on balance whether material injury or the threat thereof exists; rather, the Commission's responsibility at the preliminary stage is simply to find whether any facts reasonably raise the possibility of injury. 591 F.Supp. at 650.

While defendant concedes that the reasonable indication standard establishes a low threshold for continuing an investigation, the Commission insists that it may weigh the evidence developed during a preliminary investigation and make a negative determination when clear and convincing evidence exists that imports are not possibly causing material injury or the threat of material injury to the domestic industry. The Commission maintains that respecting the investigations under review it properly applied the reasonable indication standard when it "evaluated" all of the evidence on the record and resolved the conflicting evidence against the plaintiff. The Commission admits, however, that measured against the standard laid down in *Republic Steel*, the determinations reviewed in the instant case as to material injury and threat of material injury are unlawful and that the action must be remanded to the Commission.[2]

Defendant and intervenors attempt to sidestep *Republic Steel* by pointing to the decision of our Court of Appeals in *United States v. Roses, Inc.*, 706 F.2d 1563 (Fed. Cir., 1983). In *Roses* the Court held that the Commerce Department in a sufficiency evaluation of a dumping petition should apply its expertise to evaluate the petition and supporting data "in light of a wide body of other information." The Appellate Court in *Roses* did not, however, go so far as to hold that the agency should prejudge the matter and screen out petitions on the ground that it knows of conflicting evidence.

Reliance by intervenors Crystal International Corporation, and Flachglas A.G. on

*Budd Company Railway Division v. United States*, 1 CIT 67, 507 F.Supp. 997 (1980) is also misplaced since the issue presented here was not raised.

■ While the Commerce Department, of course, should avoid commencement of unwarranted investigations, Congress never intended the agency at the initial stage of the antidumping proceedings to summarily reject petitions simply because the agency has knowledge of conflicting evidence. This conclusion is inescapable in light of the statutory requirement that the agency must make a preliminary affirmative determination of LTFV sales if "there is a reasonable basis to believe or suspect" that the merchandise under investigation is being sold at LTFV. 19 U.S.C. § 1673b(b)(1). This provision is a clear expression of Congressional intent to provide extremely low threshold standards at the preliminary investigatory stages of antidumping proceedings. Clearly, the "reasonable indication" standard applicable to the Commission's preliminary investigations, like the "reasonable basis to believe or suspect" standard applicable to the Commerce Department's preliminary LTFV investigations, was intended by Congress to be administered as a very low evidentiary threshold for an affirmative preliminary determination, which permits the investigation to continue to the final investigatory stage where the record may be more fully developed.

■ Here, the Commission's preliminary injury determinations did not address the question of whether there is sufficient information in the record to raise the possibility of injury, but rather sought to definitively resolve the issues by weighing the conflicting evidence. Put another way, the Commission's "preliminary" determination, in effect, constituted a final determination predicated solely upon data submitted in the forty-five day period permitted at the preliminary stage.

---

**2.** In its motion for extension of time for filing its response to plaintiff's motion for review upon the agency record, counsel for the Com- mission stated that "resolution of the reasonable indication issue [in *Republic Steel*] could be dispositive of this case." (Motion at 2.)

Since the Commission misapplied the reasonable indication standard in contravention of *Republic Steel*, this action is remanded to the Commission for reconsideration of whether there is reasonable indication of material injury or threat of material injury to the domestic industry by reason of the subject imports in compliance with *Republic Steel*.

*Cumulation and volume of imports*

Plaintiff also contends that the Commission's failure to cumulate and consider the volume of imports were errors in the determinations.

 In *Republic Steel*, the Court held that the proper test for cumulation is whether the imported products are competing with the product of a domestic industry, and not the volume or trend in the volume of a particular segment of importations. While *Republic Steel* required cumulation in the context of a countervailing duty case, the underlying principle is equally applicable in an antidumping investigation due to the parallel functions of the Commission in both types of investigations. The record before the Commission in this case shows that the imported regular quality thin sheet glass was in direct competition for sales to the same community of purchasers. Thus, the Commission's methodology in considering the level of imports from the three countries individually was incorrect. However, since on the question of causation the Commission, in effect, conceded the existence of a significant level of imports from each individual country, cumulation of the imports from the three countries in itself would not have altered the result reached by the Commission.

It is further contended by plaintiff that the Commission's failure to discuss the volume of imports in its decision is a material error. Plaintiff's contention is without merit.

The Trade Agreements Act of 1979 directs the Commission to "consider" a number of factors in rendering an injury determination, including the volume of imports and their consequent impact. 19 U.S.C. § 1677(7)(B), (C). While ideally the Com-

mission's decision would discuss every factor considered and make findings and conclusions with respect thereto, Congress did not impose such a stringent requirement. Congress was well aware of the complexity of antidumping investigations and in recognition of the multifaceted decisional process provided that:

> The presence or absence of any factor which the Commission is required to evaluate under subparagraph (C) or (D) shall not necessarily give decisive guidance with respect to the determination by the Commission of material injury. 19 U.S.C. § 1677(7)(E)(ii).

And that:

> [The Commission] shall notify the petitioner, other parties to the investigation, and the other agency of its determination and of the facts and conclusions of law *upon which the determination is based* * * *. 19 U.S.C. § 1673b(f) [emphasis added].

Hence, it is plain that Congress did not mandate the Commission to discuss every facet of its investigation, but only "material issues of law or fact." House Doc. No. 96–153, 96th Cong., 1st Sess. 27 (1979), reprinted in 1979 U.S.Code Cong. & Ad. News 381, 665, 685.

 As previously noted, the negative determinations of the Commission conceded a significant level of imports from each of the individual countries covered by its investigations and in view of the Commission's other findings and conclusions, no further discussion of the volume of imports was necessary. Fundamentally, of course, the Commission is not required to issue findings and conclusions on an issue concerning a statutory element simply because it was presented by the petitioner. *Pasco Terminals, Inc. v. United States*, 83 Cust.Ct. 65, 85, 477 F.Supp. 201, 218 (1979), *aff'd* 68 CCPA 8, C.A.D. 1256, 634 F.2d 610 (1980); *British Steel v. United States*, 8 CIT ——, 593 F.Supp. 405 (1984). Absent a showing to the contrary, the Commission is presumed to have considered all of the evidence in the record. *Rhone Poulenc,*

*S.A. v. United States*, 8 CIT ——, 592 F.Supp. 1318 (1984). The record in the subject investigations contains import statistics relating to the volume of imports, and the Commission must be presumed to have considered them. If upon reconsideration of its determinations on remand of this action, the Commission is of the view that the volume of imports is material to its redeterminations, then of course the Commission must state its findings of fact and conclusions of law on that aspect of its investigations.

*Yield factor*

 Plaintiff urges that the Commission's analysis of the data concerning underselling and price suppression was flawed because it failed to take into account the "yield factor". Briefly stated, the yield factor relates to the quantity of marketable product that may be produced from thin sheet glass (e.g., the total number of microscope slides obtainable from a given amount of glass). Inasmuch as individual customers have different end uses for thin sheet glass and have different quality requirements, equipment and capabilities to process sheet glass as purchased from the manufacturer, a pricing analysis that attempts to quantify the yield or quality factor for each end-user is impracticable, and the selling price is the relevant statutory criterion. *Cf. British Steel Corp., supra.*[3]

### Material Retardation

Jeannette claims that the Commission erred in its determination that imports of high quality thin sheet glass from Belgium and West Germany have not materially retarded the establishment of a high quality thin sheet glass industry in the United States. The issue of "material retardation" is judicially of first impression.

As stated above, in its preliminary investigations the Commission had to determine whether there is a reasonable indication of the alleged retardation. But unlike the Commission's injury determinations under review, the negative determinations of the Commission in this case respecting material retardation did not hinge on the weighing of conflicting evidence. Rather, the Court perceives the crucial issues to be whether the Commission applied a rational criterion for applying the material retardation provision of the statute, and whether the Commission relied upon factors appropriate to the criterion.

 The legislative history of the Trade Agreements Act of 1979 gives no specific guidance as to the meaning of the phrase "material retardation" or the standards for implementing such provision. Nevertheless, we are clear that like the standard of review applicable to the Commission's preliminary determinations respecting injury, the Court must affirm a preliminary determination of material retardation unless the Commission's determination is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(A).

 In arriving at its determinations on the material retardation question in the instant investigations, the Commission applied the "substantial commitment" test. In essence, the Commission's position is that in investigations involving an industry that has not yet commenced production, there must be a sufficient indication that the industry has made a substantial commitment to commence production, and that fact must be determined on a case by case basis. *See also Certain Dried Salted Codfish from Canada,* Inv. No. 731–TA–199 (Preliminary), USITC Pub. 1571 (Sept. 1984) (Commission found a substantial commitment and reached an affirmative preliminary determination on the issue of material retardation). The substantial commitment criterion is a pragmatic approach designed to screen out applicants for relief

---

**3.** This is not to say that the yield experienced by a particular customer could not possibly be monitored and the impact of yield on price quantified. Yield is one of a number of cost factors that an end-user of thin sheet glass takes into account in deciding its source of supply and the price to be paid for the product. However, the Court holds that the statute does not require an adjustment of prices for various cost factors for the reasons expressed in *British Steel.*

who merely intend or wish to become established in an industry but have taken no substantial steps toward becoming so established. In the instant investigations, the Commission concluded that "despite its apparent interest in entering the market, Jeannette's efforts to date have not demonstrated a substantial commitment to commence production of high quality thin sheet glass." USITC Pub. No. 1376 at 14. On the basis of the record before the Commission, the Court cannot agree with plaintiff's contention that the Commission's finding was arbitrary or capricious.

 Plaintiff argues that Jeannette's substantial commitment to commence production of high quality thin sheet glass is demonstrated by the facts that Jeannette possessed the plant, equipment, skilled personnel and marketing expertise to produce both regular and high quality thin sheet glass; and that Jeannette has made certain improvements in its production facilities which affect the production of both regular and high quality thin sheet glass. According to Jeannette, the main impediment to volume production of the high quality product is the lack of flatness testing equipment, which would cost approximately $250,000.00, and would allow Jeannette to sort glass currently produced into high quality and regular quality. Jeannette asserts that the expenditure of funds for flatness testing equipment is now prohibited by the fact that the market prices of the imports are below Jeannette's projected cost of producing high quality glass and by Jeannette's present financial situation, which allegedly has been adversely impacted by the LTFV imports. Significantly, however, Jeannette has taken no steps that are targeted for the production or marketing of high quality thin sheet glass except the submission of samples to several potential customers for high quality glass. But, as found by the Commission, Jeannette's samples did not meet the customers' quality requirements in their final evaluation.[4]

The Court is unable to agree with plaintiff's criteria of a substantial commitment to commence production of high quality thin sheet glass. Rather, the record establishes that on the basis of such fundamental indicia as production capability, financial commitment, and marketing efforts, plaintiff's "commitment" to the production of the high quality product was not "substantial". On this aspect, Jeannette's refurbishment activities were clearly aimed at resurrecting general sheet glass production, and not specifically at producing high quality thin sheet glass. The argument advanced by Jeannette that the installation of an energy saving computer on the firm's furnace should be regarded as evidence of its substantial commitment to commence production of high quality thin sheet glass is untenable since, as noted by the Commission, the computer was not directly related to Jeannette's problems in entering the high quality sheet glass market. Further, as for the proposed purchase of a $250,000 flatness testing machine, the Court agrees with the Commission's finding that this equipment would not *directly* affect the quality of the glass produced.

 Finally, the Court cannot agree with plaintiff's contention that it is materially retarded in the establishment of a high quality thin sheet glass industry *by reason of* the relatively low market prices of the imports from Belgium and West Germany as compared with the projected production costs for high quality thin sheet glass. That argument presupposes the propriety of the Commission's reaching the issue of causation in considering the question of material retardation. However, since the Commission made no threshold finding of substantial commitment to commence production of high quality thin sheet glass, the Commission was not required to reach the issue of causation. *See American Spring Wire Corp. v. United States,* —— CIT ——, 590 F.Supp. 1273 (1984).

---

**4.** The Commission found that: "In two instances Jeannette's glass passed preliminary tests, but after further processing and testing, these companies discovered quality deficiencies in Jeannette's glass"; and that "a fundamental question exists regarding whether Jeannette can actually produce the high quality product. This fundamental problem overshadows Jeannette's other efforts to enter the market." USITC Pub. No. 1376 at 15–16.

In sum, the Court holds that the Commission's negative material retardation determinations are based upon a rational criterion, and that appropriate factors were considered in support of the finding that Jeannette has not made a substantial commitment to commence production of high quality thin sheet glass. The Court also concludes that the Commission's application of the substantial commitment test in the present case did not violate the low threshold standard of review articulated in *Republic Steel.*

### Conclusion

For the foregoing reasons, it is hereby ordered:

1. This action is remanded to the Commission for reconsideration of its preliminary negative determinations respecting material injury and threat of material injury in conformity with the standard of review set forth in *Republic Steel* and in conformity with this decision.

2. The Commission shall report its findings and redeterminations to this Court within thirty days after the date of entry of this order.

3. The Commission's determinations respecting material retardation are affirmed.