**GIFFORD–HILL CEMENT COMPANY,
et al., Plaintiffs,**

v.

**The UNITED STATES and the International Trade Commission, Defendants.**

No. 83–12–01737.

United States Court of
International Trade.

July 31, 1985.

Squire, Sanders & Dempsey, Washington, D.C. (Ritchie T. Thomas, William D. Kramer, and Edwin J. Madaj, Jr., Washington, D.C.) for plaintiffs.

Lyn M. Schlitt, Gen. Counsel, Michael P. Mabile, Asst. Gen. Counsel, U.S. Intern. Trade Comn., Washington, D.C. (George A. Holoch, Jr. on brief, Gracia Berg, Washington, D.C., at oral argument) for defendants.

## Opinion and Order

RESTANI, Judge:

Plaintiffs, an *ad hoc* group of portland hydraulic cement producers located in California and Nevada and the labor union representing that area's production workers, challenge a final determination of the United States International Trade Commission (ITC or Commission). In its determination, made pursuant to § 735(b)(1) of the Tariff Act of 1930, *as amended,* 19 U.S.C. § 1673d(b)(1) (1982), the Commission concluded that an industry in the United States was not materially injured or threatened with material injury, by reason of imports of portland hydraulic cement from Australia and Japan. *Portland Hydraulic Cement from Australia and Japan,* Inv. Nos. 731–TA–108 and 109 (Final), USITC

Pub. No. 1440 (October 1983). Jurisdiction in this action is predicated upon 28 U.S.C. § 1581(c) (1982). This matter is before the court on plaintiffs' motion for review of administrative determinations upon the agency record. United States Court of International Trade Rule 56.1. For the reasons that follow, the Commission's final determination is sustained.

## I. Background

Plaintiffs filed petitions with the ITC and with the International Trade Administration of the Department of Commerce (ITA), alleging that portland hydraulic cement was being imported into the United States through three terminals in California where it was sold at less than fair value (LTFV). Plaintiffs sought imposition of antidumping duties upon the imports on the ground that the imports were materially injuring the regional cement industry of California and Nevada. Subsequently, both the ITC and the ITA instituted preliminary investigations. In its preliminary determination the ITC found a reasonable indication of material injury. 47 Fed.Reg. 51,822 (November 8, 1982), *Portland Hydraulic Cement from Australia and Japan,* Inv. Nos. 731–TA–108 and 109 (Preliminary), USITC Pub. No. 1310 (November 1982). Although the ITA's preliminary findings indicate some doubt as to whether all involved Japanese imports were selling at LTFV, in its final determinations the ITA concluded that both Japanese and Australian cement were selling at LTFV. 48 Fed.Reg. 41,056 and 41,059 (September 13, 1983).

After acquiring additional information and holding a hearing in Los Angeles, the ITC issued its final negative determination. USITC Pub. No. 1440. The Commission found that portland hydraulic cement was a fungible good.[1] Therefore, the domestic product and the imports were "like products" within the meaning of 19 U.S.C.

---

[1]. Portland hydraulic cement is a substance which when mixed with water and other materials combines to form concrete. Hydraulic cement is capable of setting under water. Portland hydraulic cement is so named because it resembles a natural limestone quarried in the English Isle of Portland. USITC Pub. 1440 at A–3—A–4.

§ 1677(10) (1982).[2] Agreeing with plaintiffs, the Commission then determined that pursuant to 19 U.S.C. § 1677(4)(C) (1982) the impact of the imports upon the relevant industry was to be assessed on a regional basis. Although the imports under investigation did not appear until 1981, the Commission examined the condition of the domestic industry from January 1980 to June 1983. The Commission noted a steady drop in consumption, a decline in production, and an increase in excess capacity. It found that capacity utilization, along with production, dropped during most of the period but had a slight upturn in 1983. Shipments also followed the trend of production and capacity utilization while inventories increased throughout the examined time period. The Commission found a continuous decline in employment but was unable to determine whether that decline was due to the drop in production or to the modernization of production facilities. Wages increased from 1980 to 1982 and then dropped very slightly in 1983. Productivity, on the other hand, was considered to have remained fairly stable.

The Commission found a significant decline in the financial condition of the domestic producers in the region. A continuous drop in net sales was noted along with an increase in cost of goods sold. Gross income substantially declined and the regional producers operated at a loss of $25 million from 1980 to 1982 and at a loss of $17 million from January 1983 to April 1983. Against this background, the Commission concluded that the California-Nevada industry was "experiencing difficulties."

■ Despite such difficulties the ITC issued a negative final determination. It concluded that the industry was not injured "by reason of" the imported cement. The element of causation required by 19 U.S.C. § 1673 and § 1673d(b)(1) (1982) was not found.[3] Absent a finding of a causal link between injury and imports, the Commission is unable to provide the domestic industry with relief. *See American Spring Wire Corp. v. United States*, 6 CIT ——, 590 F.Supp. 1273, 1276 (1984), *aff'd sub nom. Armco, Inc. v. United States*, 760 F.2d 249 (Fed.Cir.1985).

Plaintiffs now argue that the Commission erred on several grounds in failing to find a nexus of causation between imports and injury. First, plaintiffs claim that the Commission's analytic technique was unsound. Second, they contend that the Commission disregarded certain indicators of impact on the domestic industry. Third, they assert that the Commission erred in assessing the effects of the imports upon domestic prices. Finally, they argue that the Commission erroneously failed to consider the cumulative effect of the Japanese and Australian imports along with certain subsidized Mexican cement.

In reviewing the Commission's determination, this court must sustain "a final negative injury determination by the ITC ... unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.' 19 U.S.C. § 1516a(b)(1)(B) (1982)." *American Spring Wire Corp.*, 590 F.Supp. at 1276. "Substantial evidence is more than a mere

**2.** 19 U.S.C. § 1677(10) (1982) provides: "The term "like product" means a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle."

**3.** Specifically, the antidumping provision of the Trade Agreements Act of 1979, codified at 19 U.S.C. § 1673 (1982) states:

**Imposition of antidumping duties**

If—

(1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and

(2) the Commission determines that—

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded, by reason of imports of that merchandise, then there shall be imposed upon such merchandise an antidumping duty, in addition to any other duty imposed, in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise.

scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Electric Industrial Co. v. United States,* 750 F.2d 927, 933 (Fed.Cir.1984) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951), and *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)); and *quoted in American Spring Wire Corp.,* 590 F.Supp. at 1276. "The court [,however,] may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo....*'" *American Spring Wire Corp.,* 590 F.Supp. at 1276 (quoting *Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 22–23 (1st Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983) (quoting *Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. at 464). *See also Sprague Electric Co. v. United States,* 2 CIT 302, 310–11, 529 F.Supp. 676, 682–83 (1981). It is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence. *See* S.Rep. No. 249, 96th Cong., 1st Sess. at 74–75 (1979).

## II. The Commission's Analysis

In evaluating the causal relationship between the imports and the declining regional cement industry, the Commission rested its analysis on the nature of the regional cement market. Emphasizing the fungible quality of portland hydraulic cement, the Commission characterized the product as a commodity type good, and reasoned that, like other commodities, selling price was an important factor in a producer's ability to make a sale. Since all producers' products were essentially interchangeable, the ITC assumed purchase decisions would be based largely on price. Thus, the Commission concluded that significant amounts of underselling were likely to exist as aggressive suppliers tried to outsell one another while demand decreased. Accordingly, the Commission attempted to determine which firms acted as price leaders, in order to evaluate the role of the imported cement. In making that evaluation, the ITC examined data submitted by the domestic producers, the importers and information provided by purchasers.

The underpinning of the Commission's analysis is its treatment of transportation cost. The ITC found that the high value-to-weight ratio of cement caused the price of cement to increase as the distance between the purchaser's location and the supplier's terminal increased. The Commission concluded that suppliers tended to sell almost all of their cement in areas within less than 100 to 300 miles from their facilities.[4] The Commission found that the primary market for both importers and domestic producers was the metropolitan area closest to the location of a facility. The Commission noted that sales of Australian cement from the Long Beach terminal were concentrated in the Los Angeles area, while sales of Japanese cement from the Stockton terminal were most prevalent in the Northern California (San Francisco) area and Japanese cement from the San Diego terminal was sold primarily near San Diego. The Commission evaluated the effect of shipping distances within each of the three market areas by analyzing prices in geographical areas which were varying distances from the entry points of the imports. This subdivision of the three major market areas was based on the public utility zones used to regulate shipping prices in California.[5]

**4.** Approximately eighty-five percent of sales were within 100 miles of the importers' terminals.

**5.** The California Public Utility Commission regulates intra-state freight charges according to constructed mileages which integrate distances with other factors such as traffic. The Public Utility Commission sub-divides major metropolitan areas into zones to "[allow] the calculation of constructed mileages between two points within each of [the] larger metropolitan areas." USITC Pub. No. 1440 at 12 n. 38.

Also, the ITC examined the overall effects of imports in each area separately, beginning with the Australian product. Australian cement did not enter the regional market until 1981 when the Pacific Coast Cement Corporation opened a terminal in Long Beach, California. Pacific Coast sought to enter what in 1979 had been a market with high demand and short supply. The Commission found the level of consumption for the Australian product in relation to total regional consumption to have been inconsequential in 1981. The level rose in 1982 and then declined slightly in 1983.[6] Over the studied time period, the volume of Australian imports continuously increased.

The ITC focused its evaluation of the Australian imports on the product's effect in the Los Angeles area where sales were concentrated. The Commission's data showed that in a majority of instances reported by purchasers, the imported product rarely undersold the domestic product and that "almost all" price decreases were triggered by domestic producers. In regard to specific instances of lost sales and lost revenues, the ITC concluded that most of the purchasers' decisions to buy the import rather than the domestic cement were not based on price considerations. The majority of purchasers, in fact, reported that the import was priced equal to or higher than the domestic product. Finally, the Commission noted that the price declines in the immediate Los Angeles vicinity of the Pacific Coast import terminal were no greater than those in zones where no imports appeared. The ITC thus concluded that there was no significant correlation between the presence of imports and the drop in domestic supplier's prices.

Like the Australian imports, the Japanese product appeared as a response to the high demand for cement in 1979. Although only one firm imported Australian cement, four firms imported the Japanese product. Two companies were actually domestic suppliers which, during 1979 to 1981, fulfilled their own requirements by importing cement from several countries, including Japan. Two other companies, Stinnes Enterprises (Stinnes) and Melwire Trading Company (Melwire) used their own terminals to import cement in 1981 and 1982. Stinnes used the terminal at Stockton in Northern California. Melwire used a facility located in San Diego.

The Commission found a steady decline in the volume of Japanese imports from 1981 to 1983. It noted that there were no Japanese imports at all in 1983. Consumption of Japanese cement in relation to total regional consumption also dropped from 1981 to 1983. Because the Stinnes and Melwire facilities were located in different metropolitan market areas, the Commission analyzed the information acquired from San Diego and from Northern California separately.

The ITC found that Stinnes' prices on a weighted average basis were generally below the regional suppliers' prices during 1981. The domestic prices near the Stinnes terminal varied greatly in 1981. In specific instances, however, the Commission noted that Stinnes was no more competitive than the regional suppliers because Stinnes' lowest price was often higher than the domestic price. Examining prices in 1982, the ITC found that the price ranges in Northern California had narrowed. The Commission noted that "[b]etween January and August 1982, in four of the six zones for which significant price information was received, prices of Japanese cement were almost always equal to or above regional producers' prices on a weighted average basis." USITC Pub. No. 1440 at 17. The Commission did not consider Stinnes' sales in late 1982 important. Stinnes was using cement from another country rather than from Japan and the company was liquidating inventory in order to close its terminal facility. Again the ITC found no correlation between the presence of imports in various sub-market areas and declining prices in Northern California.

6. The exact levels of business are found in the

Confidential Staff Report.

The ITC drew a similar conclusion concerning Southern California. In the San Diego area, the Commission found that the decline in prices in sub-market zones where imports were present was not worse than in areas where imports were not substantially competing. Like Stinnes, Melwire's average prices were generally below the weighted average of the domestic prices but Melwire reported that imports were generally sold at rates above regional suppliers' charges. Although lost sales and revenues were confirmed, the Commission concluded that the losses did not significantly effect the domestic industry. Neither Melwire nor any regional producer, was consistently found to be the price leader in Southern California. To the Commission, the causal link between imports and injury was absent once again.

### III. Legality of the Commission's Findings

#### A. *Sub-market analysis*

Because the Commission reached its conclusions using a sub-market analysis, the propriety of that technique must be examined before other aspects of the determination are reviewed. If the use of that analysis was improper, then the Commission's findings would not be supported by substantial evidence. In this case, however, the court finds that the ITC's sub-market analysis was valid.

█ Plaintiffs claim that a sub-market analysis is proper only if each market segment could qualify as a regional market under 19 U.S.C. § 1677(4)(C) (1982). Plain-

tiffs argue that the Commission could not examine the region by looking at smaller segments based on either metropolitan areas or PUC zones because the ITC found only the entire California-Nevada area to qualify as a regional market under the statute. "A regional analysis is appropriate only in special statutorily prescribed circumstances." *Rhone Poulenc, S.A. v. United States*, 8 CIT ——, 592 F.Supp. 1318, 1329 (1984). The regional industry statute, 19 U.S.C. § 1677(4)(C), however, is designed to relieve a domestic industry's burden of demonstrating injury on a nationwide basis.[7] *See generally* H.R.Rep. No. 317, 96th Cong., 1st Sess. 73 (1979); S.Rep. No. 249, 96th Cong., 1st Sess. 82–83 (1979). There is nothing in the statute which precludes the Commission from evaluating the status of a statutory region by looking at market areas (sub-markets) within the statutory region. Moreover, the ITC defined "market area" as "a relatively narrow geographic area within which delivered prices can be directly compared because of little variation in freight charges from a particular base-point supplier to customers within that geographic area." USITC Pub. No. 1440 at A–54 n. 1. That definition is not an attempt to vary the requirements stated in 19 U.S.C. § 1677(4)(C); it is merely a way of assessing conditions in the regional market. Therefore, the Commission's sub-market analysis does not conflict with the regional industry statute.

█ Plaintiffs also argue that the market area analysis is invalid because it was incorrectly based on the assumption that

---

7. 19 U.S.C. § 1677(4)(C) (1982) provides:

**Regional industries.**
    In appropriate circumstances, the United States, for a particular product market, may be divided into 2 or more markets and the producers within each market may be treated as if they were a separate industry if—
    (i) the producers within such market sell all or almost all of their production of the like product in question in that market, and
    (ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.
In such appropriate circumstances, material injury, the threat of material injury, or mate-

rial retardation of the establishment of an industry may be found to exist with respect to an industry even if the domestic industry as a whole, or those producers whose collective output of a like product constitutes a major proportion of the total domestic production of that product, is not injured, if there is a concentration of subsidized or dumped imports into such an isolated market and if the producers of all, or almost all, of the production within that market are being materially injured or threatened by material injury, or if the establishment of an industry is being materially retarded, by reason of the subsidized or dumped imports.

sales of imports would be more prevalent in the areas closest to the import terminals than in more distant areas due to transportation costs, particularly with regard to sales of Japanese cement made by Melwire and Stinnes. To make its comparisons the Commission requested price data from both domestic producers and importers for sales made in ten market areas within the California-Nevada region. Four of the areas, MZ 221, MZ 235, MZ 242, and MZ 249, were located within metropolitan Los Angeles and were chosen because they were near the Australian import terminal. Two other market areas, MZ 307 and the community of Escondido were in theproximity of San Diego. The Commission selected those two areas to assess the impact of Japanese cement imported by Melwire. The Commission also studied the areas of MZ 101 in San Francisco and the community of Modesto to assess the effects of imports by Stinnes. For comparison purposes the Commission examined the import activity in Las Vegas, Nevada, an area over 200 miles from any of the import terminals, and in Bakersfield/Visalia, California, an area with no known import competition, which was also an average of 182 miles from the closest importer's terminal. The Commission analyzed additional market areas following receipt of responses to questionnaires sent to purchasers of cement throughout the region. *See* Tables 33 and 34 in the Commission's determination.

Plaintiffs point to the same Tables 33 and 34 as support for their position that the Commission's conclusion regarding distance and volume of sales was incorrect. The tables consolidate data obtained from purchasers concerning price trends by year from January 1981 to June 1983. Plaintiffs claim that this data demonstrates that there were no sales of imports in some areas within 100 miles of the Stinnes terminal in Stockton while sales occurred in the Chouchilla area 197 miles away from Stockton. Those occurrences, however, invalidate neither the ITC's analytic technique

nor the results of its application to study of Northern California market areas.[8]

The data in Table 34 was compiled from data in Tables C–19 through C–28 of the Commission's Confidential Staff Report (USITC Pub. No. 1440 at A–148 to A–157 (modified version)). Those additional tables listed price ranges and weighted average prices for each area in Table 34 for domestic and imported cement in each month of the thirty month period ranging from January 1981 to June 1983. From that information, the number of months out of the total thirty months in which there were sales of imports in each market area can be compared to the distance of the respective market area from the Stockton terminal.

Out of the eight studied areas within 100 miles of Stockton, there were five areas in which imports appeared for at least ten months. Within the range of 100 to 200 miles from Stockton there were no areas with over eight months of sales for the thirty month period. Of the six areas examined in the 100–200 mile range, three areas saw no imports. Eight months of imports did occur, however, in Chouchilla. Four market areas an average distance of 200 miles and further from Stockton, were analyzed but only one month of sales was recorded.

Within 100 miles of Stockton at Tracy (21 miles away) and Jackson (49 miles away) no import sales were recorded. In Twain Harte (76 miles away) only two months of import sales were recorded. Even when this data is combined with the data from Chouchilla the Commission's premise remains valid. Graphically displayed, the data in Tables C–19 through C–28 generally produces a downward sloping curve. Only the four above-mentioned points out of a possible eighteen points are grossly off the curve. Thus, there is substantial evidence behind the distance/volume of sales correlation as found in Northern California. The three areas where no sales occurred within 100 miles of Stockton indicate no more than the possibility that pur-

8. Tables 33 and 34 chart *average* distance from an import terminal. Thus, the court's reference

to any distances mentioned in those tables is to an average distance from the relevant importer.

chasers in these communities chose not to buy imported cement. The sales in Chouchilla indicated that the correlation was not perfect. That is, however, insufficient grounds for the court to conclude that the Commission did not act upon substantial evidence in utilizing the sub-market analysis in its study of Stinnes' imports in Northern California.

Substantial evidence also exists to support the Commission's distance theory regarding the Southern California market areas in relation to Japanese imports. *See* USITC Pub. No. 1440 Table 33. For Southern California the ITC examined twenty-four areas. The appended tables in the Staff Report indicate that only in areas within 100 miles of the import terminal at San Diego were there more than four months of sales recorded in the thirty month period. Only within areas within 75 miles of the terminal were there more than ten months of sales. From distances of 100 miles and greater from the terminal seventeen communities were examined. Of those seventeen communities, Japanese cement was purchased in only four areas for a time period that ranged between one and three months. There were no recorded sales of Japanese imports during the thirty month period for fourteen of the seventeen communities over 100 miles from the San Diego terminal. Thus, the data accumulated from the additional tables again support the Commission's analytical technique.[9]

### B. *Impact of Imports on Domestic Industry*

■ In evaluating injury caused by dumping, the ITC must follow statutory guidelines which set forth certain indicia of injury that the Commission must consider. 19 U.S.C. § 1677(7) (1982). These indicia include the volume of imports, the effect of imports on prices of the like domestic product, and the impact of imports on domestic producers of the like domestic product.[10] *See* Victor, *Injury Determinations by the United States International Trade Commission in Antidumping and Countervailing Duty Proceedings*, 16 N.Y.U.J. Int'l L & Pol. 749, 756–60 (1984).

Plaintiffs claim that the Commission's determination emphasized the effect of imports on prices and considered the volume of imports but did not give "impact on domestic producers" the consideration required by law. The Commission's responsibility in evaluating the impact of imports is detailed in 19 U.S.C. § 1677(7)(C)(iii) (1982) which provides:

—In examining the impact on the affected industry, the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices, and

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

■ Plaintiffs claim that the impact of imports included confirmed lost sales of 115,000 short tons of cement during the

---

**9.** Plaintiff pointed to no data which was inconsistent with the volume/distance correlation with regard to the Los Angeles area.

**10.** Specifically, 19 U.S.C. § 1677(7) (1982) provides:

**(A) In general**
The term "material injury" means harm which is not inconsequential, immaterial, or unimportant.
**(B) Volume and consequent impact**

In making its determinations under sections 1671b(a), 1671d(b), 1673b(a), and 1673d(b) of this title, the Commission shall consider, among other factors—
(i) the volume of imports of the merchandise which is the subject of the investigation,
(ii) the effect of imports of that merchandise on prices in the United States for like products, and

three and one-half year study,[11] and that *ipso facto*, such an impact demonstrated a causal nexus between imports and injury. Plaintiffs argue that the lost sales caused material injury by leading to downturns in revenues, production, capacity utilization and employment. In essence, plaintiffs assert that the ITC erred by applying a test of causation that was too strict. Plaintiffs allege that the Commission impermissibly weighed the impact of the imports against other factors instead of merely requiring that the imports minimally contributed to the injury suffered by the domestic industry as required under *British Steel Corp. v. United States*, 8 CIT ——, 593 F.Supp. 405, 413 (1984).

In a related line of reasoning plaintiffs argue that the Commission failed to consider all sales lost by domestic producers to imports because the ITC considered only sales lost due to price undercutting as "lost sales." Plaintiffs contend that the Commission ignored purchases of imports for non-price reasons and those purchases should have been included by the ITC among lost sales impacting on the regional industry. Thus, plaintiffs argue the Commission erroneously required that the injury be caused by *dumping* rather than by dumped imports. In any case, plaintiffs urge that but for an LTFV selling price, the imports could not have been sold at all in the California-Nevada market.

The Commission's observations regarding lost sales were stated in three separate parts of the final determination. First, with regard to the Australian product, the Commission stated:

Information regarding allegations of lost sales and lost revenues further supports the conclusion that Pacific Coast met rather than undercut domestic prices. Almost all of the purchasers contacted

(iii) the impact of imports of such merchandise on domestic producers of like products.

11. The dollar value of such sales is approximately $7–8 million. Total annual domestic sales in the region totalled approximately one-half billion dollars.

regarding such allegations stated that the price of Australian cement was equal to or higher than the price of the domestic cements and cited nonprice reasons for purchasing Australian cement. Our analysis of direct bid projects shows little evidence of lost sales or lost revenues by regional producers due to competition by Pacific Coast.

USITC Pub. No. 1440 at 14 (footnotes omitted). Second, with respect to the Japanese imports sold by Melwire, the Commission stated that:

Several allegations of lost sales and lost revenues were confirmed. However, information received with regard to the issue of price leadership shows that neither Melwire nor any individual domestic producer was consistently identified as possessing a role of price leadership in the San Diego area. Thus, we conclude that these instances of lost sales and lost revenues are not significant enough to have had a significant adverse effect on domestic producers.

USITC Pub. No. 1440 at 19. Third, with respect to all of the Japanese imports, the Commission stated that:

Thus, there are instances in these investigations of underselling, lost sales, and lost revenues related to imports from Japan. However, these instances are not indicative of a price-depressing effect of Japanese cement in the marketplace.

USITC Pub. No. 1440 at 20.

The Commission is not obligated to rest its decision on either lost sales or lost revenues, especially in view of the volumes of lost sales and revenues involved here in comparison to total sales. Lost sales and revenues may be only two possible signals of impact.[12] Although the Commission

12. The statutory scheme itself contains the provision stating that "[t]he presence or absence of any factor which the Commission is required to evaluate under subparagraph (C) or (D) [of 19 U.S.C. § 1677] shall not necessarily give decisive guidance with respect to the determination by the Commission of material injury. 19 U.S.C. § 1677(7)(E)(ii) (1982). *See also* 19 C.F.R. § 207.27 (1983). The legislative history of the

must rule in the affirmative if it finds even slight contribution from imports to material injury, and the Commission should not weigh that contribution "against the effects associated with other factors (*e.g.*, the volume and prices of imports sold at fair value, contraction in demand or changes in patterns of consumption ...)", S.Rep. No. 249, 96th Cong. 1st Sess. 74 (1979), the presence of certain indicators such as lost sales or revenue does not automatically mean that imports contributed to a significant downturn in a domestic industry.

Furthermore, the statutory scheme does not mandate that the Commission must consider lost sales *per se*. Although the law requires the ITC to assess impact of imports on the domestic industry, the Commission need not make an impact analysis based on a specific type of lost sales analysis. Where fungible goods are concerned, volume may be the best indicator of lost sales rather than the anecdotal evidence obtained in the typical lost sales study.[13] The Commission now argues that the sales lost to Japanese and Australian imports may have replaced sales previously lost to extra-regional domestic suppliers and other importers. The Commission did not make such a finding, rather the Commission seems to consider volume of imports and sales lost to imports insignificant in the context of the injury in this case. In the instant case, the Commission primarily used lost sales to measure the price effects of imports upon the domestic commodity-type product. Sales lost due to underpricing is an important test of injury in the case of fungible goods. Merely because the ITC did not focus on lost sales *per se* does not mean that it was looking only at

injury due to sales at LTFV or that it weighed causes, as plaintiffs allege. The Commission looked at the volume of imports and at the overall effect on prices in the context of the depressed state of the industry. From such data it concluded, in essence, that imports were not a contributing cause of the injury suffered by the industry.

An additional concern is whether substantial evidence exists to support the Commission's conclusions in light of the lost sales evidence. For the Australian cement, there were allegations of lost sales involving twenty-seven ready-mix companies. In its verification using purchasers' answers to questionnaires, the Commission found that twenty-three of those companies purchased Australian cement. Only one of those purchasers, however, cited a lower price as the reason for choosing the import. Among the non-price reasons for choosing the Australian product were relationships with the importers sales staff, a desire to have a secondary supply source, location, availability, and suitability for specific purposes or quality.[14] In terms of lost revenue, only six purchasers of a group of twenty-nine purchasers, many of which also answered lost sales questionnaires, stated that they used the presence of Australian prices to negotiate lower prices from domestic producers. Overall the lost sales study is consistent with the Commission's finding regarding Australian cement.

Regarding Japanese cement, domestic producers alleged that from April 1981 to June 1983 they lost sales involving forty-seven ready-mix companies. The Commission contacted thirty-two of those compa-

---

provision suggests that it also pertains to the issue of causation. Thus, H.R.Rep. No. 317, 96th Cong., 1st Sess. 46 (1979) stated: "The significance of the various factors affecting an industry will depend upon the facts of each particular case. Neither the presence nor the absence of any factor listed in the bill can necessarily give decisive guidance with respect to an injury determination." *See also* S.Rep. No. 249, 96th Cong., 1st Sess. 88 (1979).

**13.** Although 19 U.S.C. § 1677(7)(C)(iii)(I) requires the Commission to evaluate "decline in

... sales" as part of its impact analysis, the statute does not speak of "sales lost to imports."

**14.** Unlike the case of *The Maine Potato Council v. United States*, 9 CIT ——, 613 F.Supp. 1237 Slip Op. 85–69 (1985), where the ITC found that the quality of the imported products contributed to the competitiveness of the imports. No such finding of a consistent quality difference between the imported and domestic product exists in this case.

nies and found twenty-five had purchased the Japanese product. Of those twenty-five, seven cited lower prices as the major reason for the purchases. Ten of the remaining firms did note, however, that although price was not the reason for the purchase, the Japanese product was lower priced than the domestic cement. The ITC contacted forty-five of the eighty-six purchasers named in the lost revenue allegations and found that seventeen of twenty-eight firms that purchased Japanese cement reported that the Japanese product was priced lower than domestic cement. Eight firms that purchased both imported and domestic cement stated that they used Japanese prices in negotiating lower domestic prices. Five firms that did not purchase Japanese cement did, however, state that they used Japanese offers in negotiations with domestic producers. This evidence is inconclusive. It could support several findings depending on other evidence gathered. Since this court is not the trier of fact, it cannot weigh this evidence in the first instance. There is nothing in the lost sales study which detracts from the other evidence in support of the Commission's findings regarding Japanese cement to such an extent that the Commission's finding must be set aside.

In a related ground of attack upon the Commission's impact findings, plaintiffs argue that the ITC considered only lost sales and revenue, while failing to fully evaluate the impact of imports in terms of the other factors, *i.e.* profits, market share, productivity, utilization of capacity. Plaintiffs claim that although the Commission mentioned those "impact" factors in its description of the declining state of the industry, it failed to analyze the factors as indicia of causation. First, the Commission is charged only with rationally considering impact on the domestic industry in light of the relevant factors in each case. 19 U.S.C. § 1677(7)(C)(iii)(I) (1982). Second, "the Commission is not required to issue findings and conclusions on an issue concerning a statutory element simply because it was presented by the petitioner." *Jeannette Sheet Glass Corp. v. United States,*

9 CIT ——, 607 F.Supp. 123, 130 (1985) (citing *Pasco Terminals, Inc. v. United States,* 83 Cust.Ct. 65, 85, 477 F.Supp. 201, 218 (1979), *aff'd,* 68 C.C.P.A. 8, 634 F.2d 610 (1980) and *British Steel v. United States,* 8 CIT ——, 593 F.Supp. 405 (1984)) *appeal docketed,* No. 85–2455 (Fed.Cir. May 24, 1985), *alternative motions for temporary restraining order or stay denied,* 9 CIT ——, Slip Op. 85–71 (July 10, 1985). "Absent a showing to the contrary, the Commission is presumed to have considered all the evidence in the record." *Jeannette,* 607 F.Supp. at 130. As in the *Jeannette* case, the record in this case, particularly USITC Pub. No. 1440 at A–1— A–110, contains data concerning the challenged factors, "and the Commission must be presumed to have considered them". *Jeannette,* 607 F.Supp. at 130. Data for such factors as consumption and market share (Table 22), capital expenditures (Table 19), and income and loss (Tables 12–17) are all found in the determination.

## C. *Price Effects.*

■ Plaintiffs further challenge the ITC's decision concerning the price effects of the imports. By statute the Commission must consider whether:

> (I) there has been significant price undercutting by the imported merchandise as compared with the price of like products in the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii) (1982). The Commission must therefore examine whether imports forced domestic prices downward or kept domestic prices at artificially low levels.

■ Plaintiffs claim that the imports were a significant factor in price declines in the regional industry for two reasons. First, plaintiffs raise an economic argument urging that imports depressed the industry because imported cement consti-

tuted a new source of supply in a market where supply already exceeded demand. Second, plaintiffs assert that imports contributed to a downward spiraling of prices by leading prices in certain instances.

More specifically, plaintiffs point to Stinnes' sales record in Northern California. Plaintiffs note that the Commission found that during 1981 the weighted average price of imported cement was usually below that of the domestic producers. They claim that Stinnes undersold domestic producers in 54% of reported purchases in 1981. Plaintiffs also point to an obvious error in the Commission's calculations in Table C–23 of the Staff Report concerning underselling in Chouchilla, California. When correctly recalculated those, figures add four instances in which the weighted average of Japanese prices was lower than domestic prices. Plaintiffs argue that the corrected data shows that Japanese cement was the underseller in over half of the total comparisons with domestic prices. These facts, argue plaintiffs, render incorrect the Commissions statement that based on price, Stinnes was no more competitive than domestic producers.

Plaintiffs also argue that all the compiled data actually shows a positive correlation between the presence of imports and declines in regional producers' prices. For Northern California, the ITC reported that regional producers' prices declined in a range of 15% to 21% while prices in areas without imports declined in a range of 12% to 18%. Plaintiffs argue that prices in areas with imports actually declined a minimum of 17%.[15] The Commission explained that areas without imports present also appeared to have less competition among domestic producers. The Commission specifically noted that some purchasers in areas in which no imports were present reported buying from only one domestic producer. The Commission thus provides one possible explanation for the differences in price declines between the areas.

Plaintiffs then raise similar arguments in terms of the Melwire terminal and southern California zones. Again, the Commission stated that Melwire's prices were above regional producers' actual prices although generally below domestic prices on a weighted average. Plaintiffs point to data indicating that Melwire's weighted average price was below the domestic weighted price in 74% of the comparisons and that Melwire's lowest actual price was lower than the domestics in 45% of the Commission's comparisons. The Commission, however, noted that responses to its questionnaires did not reveal any consistent price leader.

Plaintiffs argue that the Commission erred in concentrating on the lowest recorded price rather than considering the trend of weighted averages. According to plaintiffs, the presence of some sales below domestic prices in an industry with declining demand forced all prices down. Therefore, plaintiffs claim that the Commission erroneously examined whether the imports persistently led price undercutting. To plaintiffs, there could never be one price leader in a price war situation which was the result of declining demand.

It appears to the court that the key to the Commission's negative injury determinations is the conclusions regarding price effects discussed here, particularly its finding regarding price declines in areas of no import competition. The finding that prices dropped virtually in the same degree in areas where imports were present and in areas where imports did not compete has not been shown to be unsupported by substantial evidence. The Commission's conclusion is based on a valid sub-market analysis which was designed to demonstrate the overall price effects of the imports. The declines are not perfectly symmetrical, but such symmetry cannot be expected in a dynamic market place.

In addition, the Commission's mathematical errors are not so gross as to invalidate the sub-market analysis or the conclusions following from it. Nor have plaintiffs demonstrated that failure to rely on averages

15. Plaintiffs claim that the relevant average price declines differed by 6%.

in certain instances masked any significant evidence of contribution to causation of injury. Furthermore, plaintiffs' theory of intermittent price leadership in a downward price spiral caused in part by imports, while plausible, is simply another rational characterization of the evidence. "That [plaintiffs] can point to evidence of record which detracts from the evidence which supports the Commission's decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive. It is, not the function of [the] court to decide that, were it the Commission, it would have made the same decision on the basis of the evidence." *Matsushita Electric Industrial Co. v. United States,* 750 F.2d 927, 936 (Fed.Cir.1984).

This same rationale applies to the Australian product. The Commission found that price undercutting, suppression and depression by the Australian imports was simply not significant. The results of the sub-market analysis showed that "[r]egional producer's prices in the metropolitan Los Angeles zones, where competition from Australian cement was most direct, declined by similar amounts to prices in Bakersfield/Visalia, a market area where no known import competition" existed. USITC Pub. No. 1440 at 14. Examining price declines for both market areas during the period of December 1981 to December 1982, the ITC found a 10% to 13% price decline in Los Angeles. For Bakersfield/Visalia the Commission found a similar decline of 12% to 13%. Plaintiffs suggest several other factors may have caused these results, but they offer no support for their suggestions. They also dispute the exact percentages of decline and their method of calculation, but do not appear to disagree with a 10–14% range of decline for both areas.

Plaintiffs also claim that the Commission erred by limiting its survey of price declines to a twelve month period ending in December 1982. Plaintiffs claim that had the ITC examined prices from the first appearance of Australian imports in 1981, the Commission would have noted a time lag between declines in Los Angeles and Bakersfield. The Commission, however, provided a rational explanation for its limited survey when it stated that the level of consumption of the imports was inconsequential during 1981. USITC Pub. No. 1440 at 12. Tables 23 to 26 in the Commission's determination provide substantial evidence for that conclusion. *See also* USITC Pub. No. 1440 at A–66. Only in MZ 221, depicted in Table 23, were imports listed for 1981. Moreover, those imports only began to appear in September of 1981. Although the evidence in support of the Commission's findings regarding price effects is not overwhelming, it is clearly more than a "mere scintilla." The court finds plaintiffs' arguments inadequate to warrant a finding of lack of substantial evidence regarding price effects.

### D.  *Cumulation*

■ Finally, plaintiff's claim that the Commission erred by conducting its analysis without examining the cumulative effect of all the Japanese and Australian imports together with the effect of certain subsidized Mexican cement. Plaintiffs assert that cumulation was mandatory under the case of *Republic Steel Corp. v. United States,* 8 CIT ——, 591 F.Supp. 640 (1984), *reh'g denied,* 9 CIT ——, Slip Op. 85–27 (March 11, 1985). Plaintiffs claim that the imports not only competed with the domestic cement in more than one area but that the imports, through such avenues as sales lost and price effects, contributed to injury throughout the entire regional industry. Plaintiffs further argue that the Commission also erred by failing to articulate its reason for not cumulating the imports.

Plaintiffs cite *Matlovich v. Secretary of Air Force,* 591 F.2d 852, 857 (D.C.Cir.1978) in support of their argument that the ITC was obligated to specifically state why it chose not to cumulate in this case. That case is distinguishable from the one at bar. In *Matlovich,* an agency acted without any record of the reason for its action. Here, the Commission's actions and its reasons

therefor are easily discernable for purposes of review.[16]

The Commission argues that cumulation is discretionary. In support of its decision not to cumulate, it notes that importers sold 85 percent of their goods within 100 miles of the import terminals. To the ITC, the market areas of each of the imports were segmented with very little overlap in markets between imports from Australia, the Stinnes terminal in the north, and Melwire in the south. The Commission asserts that the sub-market analysis demonstrated that the imports did not produce "ripple effects" which could have influenced the entire regional industry. Therefore, the Commission now claims that the lack of causation or contribution to injury was self-evident and cumulation was not warranted.

The record supports the Commission's finding that each group of the imports entered the region in different areas and affected only limited areas of the region, although certain domestic suppliers operated in more than one major sub-market. The typical case involving cumulation concerns a limited area which is affected by imports from several sources. In the instant case, several areas were affected but each area was found to be affected by only one source of imports. In addition, the Commission apparently found lost sales to be an insignificant indicator of injury and the Commission found no significant price effects.[17] Having sustained these findings, the court can find no basis to remand for further cumulation.[18]

Furthermore, plaintiffs' view that cumulation is mandatory in every case under the statute applicable to this case is not supported. *Republic Steel* held that in a preliminary countervailing duty determination cumulation was essential to determine the possibility of material injury. In that early stage, specific findings of causation were found to be out of place. The *Republic Steel* court, however, stated that in a final determination cumulation was not mandatory in every case. Thus, the court explained:

> Cumulation operates on its own terms at the preliminary determination to require the consideration of the combined effect of all competitive, subsidized, or allegedly subsidized importations of a particular product. *It operates at the final determination only in conjunction with findings of contribution to injury from the products of particular countries.*

591 F.Supp. at 646 (Emphasis added).

The essential problem for plaintiffs here is not that the Commission failed to consider the injury caused by imports from all countries, rather that it simply found no nexus of causation with regard to imports from any country.

Accordingly, the court finds that use of the sub-market analytical technique was not contrary to law, that the Commission's findings with regard to impact on the domestic industry and effect on domestic prices were made in accordance with law and are supported by substantial evidence, and that the Commission did not err in its treatment of cumulation. Therefore, this action is dismissed.

---

**16.** With regard to allegedly subsidized imports from Mexico which apparently did compete with Melwire's product, plaintiffs conceded at oral argument that no case law compels cumulation between LTFV and subsidized imports and no statute applicable to this case appears to mandate such treatment.

**17.** Cumulated volume and consumption data are found in the Staff Report.

**18.** The court makes no finding as to whether in another context cumulation would be appropriate even absent imports directly competing with each other.